**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| **CAROL BELYEA, BRUCE BELYEA, LUCILLE BOTELHO, WAYNE BOTELHO, and CHARDON MAHAN** on behalf of themselves and all others similarly situated,<br><br>        **Plaintiffs,**<br>**vs.**<br><br>**LITTON LOAN SERVICING, LP,**<br><br>        **Defendant.** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **C.A. NO.  10-10931-GAO**<br><br><br>**Leave to file granted November 1, 2010** |

**PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS
OF LITTON LOAN SERVICING, LP**

# TABLE OF CONTENTS

**Page**

Table Of Authorities ....................................................................................................ii

I.      INTRODUCTION ...............................................................................................1

II.     BACKGROUND: LANGUAGE OF THE CONTRACT AND PLAINTIFFS'
        ALLEGATIONS...................................................................................................3

III.    LEGAL STANDARD..........................................................................................5

IV.     ARGUMENT ......................................................................................................6

        A.      Litton Mischaracterizes Plaintiffs' Legal Position ........................................6

                1.      The HAMP Cases Litton Cites Have No Bearing on a Claim for
                        Breach of the TPP Agreement between Litton and its Borrowers.....7

                2.      Litton Distorts Plaintiffs' Position Regarding Eligibility ................11

        B.      Plaintiffs Have Stated a Claim for Breach of Contract..................................14

                1.      Plaintiffs Have Adequately Alleged Consideration..........................14

                2.      Plaintiffs Sufficiently Allege Damages ...........................................19

                3.      The TPP Agreements Are Complete, Enforceable Contracts...........22

        C.      Plaintiffs Have Stated a Claim for Breach of Contract of the Covenant
                of Good Faith and Fair Dealing ..................................................................23

        D.      Plaintiffs Have Made Allegations Sufficient to Entitle Them to Relief
                Based Upon Promissory Estoppel................................................................26

        E.      Plaintiffs State a Claim for Relief Under G.L. c. 93A ..................................27

                1.      Analyzed Under the Correct Standard, the Complaint Adequately
                        Alleges Unfair and Deceptive Acts or Practices..............................27

V.      CONCLUSION.................................................................................................30

# TABLE OF AUTHORITIES

Page

## Cases

*Aleem v. Bank of America*,
  No. EDCV 09-01812, 2010 WL 532330 (C.D. Cal. Feb. 9, 2010) ...................................... 10

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)................................................................................................................ 5

*Brooks v. White*,
  43 Mass. 283 (1841) ............................................................................................................. 18

*Brown v. First Tenn. Nat'l Ass'n*,
  C.A. No. 1:09-CV-0679-BBM (N.D. Ga. Nov. 20, 2009).................................................... 9

*Bucholz v. Green Bros. Co.*,
  272 Mass. 49 (1930) ............................................................................................................. 20

*Cavanaugh v. U.S. Government*,
  640 F. Supp. 437 (D. Mass. 1986) ....................................................................................... 26

*Chalfin v. Beverly Enterprises, Inc.*,
  741 F. Supp. 1162 (E.D. Pa. 1989) ....................................................................................... 9

*Clark v. Gulesian*,
  197 Mass. 492 (1908) ........................................................................................................... 20

*College Loan Corporation v. SLM Corporation*,
  396 F.3d 588 (4th Cir. 2004) ............................................................................................... 10

*Commonwealth v. Fremont Investment & Loan*,
  452 Mass. 733 (2008) ........................................................................................................... 11

*Daddario v. City of Pittsfield*,
  301 Mass. 552 (1938) ........................................................................................................... 19

*Don v. Soo Hoo*,
  75 Mass. App. Ct. 80 (2009)................................................................................................. 21

*Downer v. Whittier*,
  144 Mass. 448 (1887) ........................................................................................................... 14

*Emerson v. Deming*,
  304 Mass. 478 (1939) ........................................................................................................... 18

*Escobedo v. Countrywide Home Loans, Inc.*,
  No. 09-cv-1557-BTM(BLM), 2009 WL 4981618 (S.D. Cal. Dec. 15, 2009)...................... 8

*Evans v. Yegen Associates, Inc.*,
  556 F. Supp. 1219 (D. Mass. 1982) ..................................................................................... 20

*Fall River Housing Joint Tenants Council, Inc. v. Fall River Housing Authority*,
  15 Mass. App. Ct. 992 (1983).............................................................................................. 14

*FAMM Steel, Inc. v. Sovereign Bank,*
   571 F.3d 93 (1st Cir. 2009) .......................................................................................... 25

*Gaitan v. Mortgage Elec. Registration Sys.,*
   No.  EDCV 09-1009-VAP, 2009 WL 3244729 (C.D. Cal. Oct. 5, 2009) ............................ 8

*George W. Wilcox, Inc. v. Shell Eastern Petroleum Products,*
   283 Mass. 383 (1933) ................................................................................................ 23

*Given v. Commerce Ins. Co.,*
   440 Mass. 207 (2003) ................................................................................................ 13

*Grossman v. Waltham Chem. Co.,*
   14 Mass. App. Ct. 932 (1982) ..................................................................................... 28

*Hacker v. Nitschke,*
   310 Mass. 754 (1942) ................................................................................................ 19

*Hagan v. Riley,*
   13 Gray 515 (Mass. 1859) .......................................................................................... 20

*Hoffman v. Bank of America, N.A.,*
   No. C-10-2171-SI, 2010 WL 2635773 (N.D. Cal. June 30, 2010) ............................... 7, 8

*In re Lloyd, Carr and Co.,*
   617 F.2d 882 (1st Cir. 1980) ....................................................................................... 18

*Incase Inc. v. Timex Corp.,*
   488 F.3d 46 (1st Cir. 2007) ......................................................................................... 27

*Ionco v. Jensen Constr. Co.,*
   622 F.2d 1291 (8ᵗʰ Cir. 1980) ...................................................................................... 9

*Liss v. Studeny,*
   450 Mass. 473 (2008) ................................................................................................ 26

*Marine Contractors Co., Inc. v. Hurley,*
   365 Mass. 280 (1974) ................................................................................................ 18

*Marks v. Bank of Am., N.A.,*
   No. 03:10-cv-08039-PHX-JAT, 2010 WL 2572988 (D. Ariz. June 22, 2010) ................. 8

*Massachusetts Employers Ins. Exchange v. Propac-Mass, Inc.,*
   420 Mass. 39 (1995) .................................................................................................. 27

*Massachusetts v. Mylan Laboratories,*
   608 F. Supp. 2d 127 (D. Mass. 2008) .......................................................................... 25

*McKensi v. Bank of America, N.A.,*
   No. 09-11940-JGD, 2010 WL 3781841 (D. Mass. Sept. 22, 2010) ................................ 8

*Moss v. Camp Pemigewassett,*
   312 F.3d 503 (1st Cir. 2002) ......................................................................................... 6

*Pantoja v. Countrywide Home Loans, Inc.,*
   640 F. Supp. 2d 1177 (N.D. Cal. 2009) ......................................................................... 8

*Santos v. Countrywide Home Loans*,
    No. Civ. 2:09-02642 WBS DAD, 2009 WL 3756337 (E.D. Cal. Nov. 6, 2009) .............. 8

*Singarella v. City of Boston*,
    342 Mass. 385 (1961) ................................................................................................... 20

*Speakman v. Allmerica Financial Life Ins.*,
    367 F. Supp. 2d 122 (D. Mass. 2005) ........................................................................... 24

*States Resources Corp. v. The Architectural Team, Inc.*,
    433 F.3d 73 (1st Cir. 2005) ........................................................................................... 27

*Swanson v. Bankers Life Co.*,
    389 Mass. 345 (1983) ................................................................................................... 27

*T.W. Nickerson, Inc. v. Fleet Nat. Bank*,
    456 Mass. 562 (2010) ................................................................................................... 23

*Targus Group Intern., Inc. v. Sherman*,
    76 Mass. App. Ct. 421 (2010) ...................................................................................... 23

*Tufankjian v. Rockland Trust Co.*,
    57 Mass. App. Ct. 173 (2003) ...................................................................................... 24

*Turnpike Motors, Inc. v. Newbury Group, Inc.*,
    413 Mass. 119 (1992) ................................................................................................... 26

*Ung v. GMAC Mortg*,
    2009 WL 2902434 (C.D. Cal. Sept. 4, 2009) ................................................................. 8

*United States v. President and Fellows of Harvard College*,
    323 F. Supp. 2d 151 (D. Mass. 2004) ............................................................................. 9

*V. & F.W. Filoon Co. v. Whittaker Corp.*,
    12 Mass. App. Ct. 932 (1981) ...................................................................................... 15

*Weiner v. Pictorial Paper Package Corp.*,
    303 Mass. 123 (1939) ................................................................................................... 23

*Whitehall Co. Ltd. v. Merrimack Valley Distrib. Co., Inc.*,
    56 Mass. App. Ct. 853 (2002) ...................................................................................... 10

*Williams v. Geithner*,
    No. 09-1959, 2009 WL 3757380 (D. Minn. Nov. 9, 2009) ............................................. 7

*Wit v. Commercial Hotel Co.*,
    253 Mass. 564 (1925) ................................................................................................... 16

*Worldcare Clinical, Inc. v. Bracco Diagnostic, Inc.*,
    22 Mass. L. Rptr. 698 (Mass. Super. 2007) ................................................................. 14

**Statutes**

940 C.M.R. § 25.01 ......................................................................................................... 29

940 C.M.R. § 25.03 ......................................................................................................... 29

940 C.M.R. § 3.16 ........................................................................................................... 28

940 C.M.R. § 8.03 ......................................................................................................... 29

940 C.M.R. § 8.06 ......................................................................................................... 30

G.L. c. 93A ............................................................................................................... passim

**Other Authorities**

Black's Law Dictionary (8th ed. 2004) ......................................................................... 17

*Restatement (Second) of Contracts* ........................................................................ 16, 24

Samuel Williston, *A Treatise on the Law of Contracts* (4th ed. 2008) ........................... 15, 16, 18

**Rules**

Fed. R. Civ. P. 12(b)(6) ................................................................................................... 6

Plaintiffs Carol and Bruce Belyea, Lucille and Wayne Botelho, and Chardon Mahan, on behalf of themselves and all others similarly situated ("Plaintiffs") hereby oppose the Motion to Dismiss of Defendant Litton Loan Servicing. ("Defendant" or "Litton").[1]

## I.    INTRODUCTION

The goal of this case is to limit and rectify the harm done by Litton's practice of routinely breaking its promises made in written contracts to modify mortgages.  Absent a remedy in this Court, Litton's failure to honor its obligations will have tragic consequences:  Unnecessary and inappropriate foreclosures on Massachusetts families.

In 2009, recognizing a national economic calamity of unprecedented scope, the federal government created a program – the Home Affordable Modification Program or "HAMP" – explicitly designed to prevent foreclosures.  For privately held loans, overall participation by mortgage servicers in this program was voluntary and indeed, Litton signed up to participate. The aim of the program is to facilitate the modification of home mortgage loans.  Such modifications are intended to make home mortgages affordable for borrowers who have already defaulted or who attest to imminent default.  The form contract that lies at the heart of this case, the Trial Period Plan ("TPP") Agreement, draws on HAMP as the source of its governing principles and contains explicit language promising a permanent HAMP modification if the borrower complies with its terms during the trial period.  Thus, although Litton's overall participation in the federal program was voluntary, the contractual obligations it made to borrowers – including a key provision that "time is of the essence" – were not.

Plaintiffs in this matter are united by a common factual circumstance – each of them was

---

[1] Plaintiffs herein refer to Litton's Memorandum in Support of its Motion to Dismiss [Docket No. 17] as "Mot."

determined by Litton to be initially eligible and qualified for a Home Affordable Modification,[2] and each executed a binding TPP Agreement with Litton with an explicit bargained-for exchange – if a homeowner complied with their TPP Agreement, Litton promised to tender them a permanent loan modification with definite terms upon completion of the trial period. Each of the named plaintiffs delivered on their end of the bargain. Yet none of the Plaintiffs were tendered permanent modification offers upon completion of the trial period, as promised, nor were they told within that timeframe that they had breached the contract by failing to comply with its terms.

Litton's moving papers are built upon a fundamental and inappropriate mischaracterization of Plaintiffs' legal position. Litton repeatedly describes the premise of the lawsuit as a guarantee that every borrower whose loan is modified on a trial basis receive a permanent modification. Mot. at 9. This position misrepresents the First Amended Complaint. Plaintiffs do not assert that the fact that they were offered a TPP Agreement, standing alone, entitles them to an automatic permanent HAMP modification. Rather, it is the language of the TPP Agreement together with Litton's subsequent actions that gives rise to Plaintiffs' claims. When it offers a TPP Agreement to a homeowner, Litton has already made an initial determination that this homeowner is qualified for a HAMP modification, based on the information then in its possession. Litton concedes this key point in its own papers, stating that: "[i]f a borrower appears to be eligible for a HAMP modification, the participating servicer will offer that borrower a TPP." Mot. at 4. The language of the TPP Agreement promises a permanent HAMP modification for those homeowners who comply with its terms during the trial

_____

[2] "Home Affordable Modification" is a technical term used in the TPP Agreement and refers to a permanent loan modification the terms of which are determined in accordance with the HAMP Program Documentation.

period.  If Litton believed that its initial determination was no longer correct, or that the borrower

failed in some way to comply with the terms of the TPP Agreement, it was incumbent on Litton

to notify the borrower of that fact prior to the Modification Effective Date.  Litton's failure to do

so constitutes waiver of its right to raise those grounds as a basis for ineligibility.  Litton's

argument to the contrary would entitle it to an endless period to review eligibility and keep the

homeowner in an interminable limbo – a result that is in clear conflict with the language of the

TPP Agreement.

Litton's other arguments are also flawed.  Plaintiffs have alleged facts sufficient to

support their legal claims of breach of contract, breach of the covenant of good faith and fair

dealing, promissory estoppel and violation of G.L. c 93A, and those claims should not be

dismissed.

## II.    BACKGROUND:  LANGUAGE OF THE CONTRACT AND PLAINTIFFS' ALLEGATIONS

The TPP Agreements that lie at the center of this dispute are form contracts between

Plaintiffs and the servicer of their mortgages.  *See* FAC, Exhibits 7, 8, 10 & 11.  The promise on

which Plaintiffs' claims rest is made explicit from the very first sentence of the TPP Agreement:

> If I am in compliance with this Trial Period Plan, and my representations
> in Section 1 [regarding verification of information] continue to be true in
> all material respects, then the Lender will provide me with a Home
> Affordable Modification Agreement ("Modification Agreement"), as set
> forth in Section 3. . . .

*See, e.g.,* FAC, Ex. 11 at 1.

The TPP Agreement establishes a time frame for performance by both parties and

provides that "TIME IS OF THE ESSENCE."  *See, e.g.,* FAC, Ex. 11 at §§ 2, 2(A) (emphasis in

original).  Section 2 defines "Modification Effective Date" as "the first day of the month

following the month in which the last Trial Period Payment is due" and defines the Trial Period

as ending "on the earlier of" the Modification Effective Date or the termination of the Trial

Period. *See, e.g.,* FAC, Ex. 11 at §§ 2.  Section 2 also sets out the dates and amounts of the three

payments due from the borrower. *Id.*  The TPP Agreement provides that the borrower's

representations must be true and correct "as of the date I signed this Plan" and "at any time

during the Trial Period." *See, e.g., id.* at §§ 2, 2(F).  The Lender, meanwhile, is required to

provide a signed copy of the Plan and Modification Agreement by the Modification Effective

Date (*Id.*) or "a written notice that [the borrower] do[es] not qualify for the Offer." *Id.* at 1.

Litton, therefore, may not wait for some indeterminate number of months after the close of the

contractual trial period to inform Plaintiffs that they are not entitled to a HAMP modification.

Each of the named Plaintiffs completed the HAMP application process, were determined

initially eligible for a HAMP modification, passed the NPV test and were tendered TPP

Agreements.  FAC at ¶¶ 48-49 (Belyeas), ¶¶ 78-79 (Botelhos), ¶¶ 102-103 (Mahan).  Each of the

named plaintiffs executed and returned the TPP Agreement that was offered to them.  FAC at ¶

50 (Belyeas), ¶ 80 (Botelhos), ¶ 104 (Mahan).  Litton concedes as much. *See* Mot. at 6-9.  Each

of the named plaintiffs made the payments called for under the TPP Agreement, and indeed,

continued payments after the trial period ended.  FAC at ¶ 55, 66 (Belyeas), ¶ 86, 91 (Botelhos),

¶ 111 (Mahan).  Last, all named plaintiffs fully complied with all documentation requests made

to them, FAC at ¶ 52 (Belyeas), ¶ 70 (Meek), ¶ 88 (Williams), and with all other terms of the

TPP Agreements.  FAC at ¶ 56 (Belyeas), ¶ 93 (Botelhos), ¶ 112 (Mahan).

Based on the language of the TPP Agreements, their performance, and Litton's failure to

notify them that they were out of compliance within the trial period, Litton was required to

tender each named plaintiff a Home Affordable Modification Agreement.  The parties agreed

that the payment terms for the modification would be determined according to guidelines

established under HAMP as well as to the effective date of the HAMP modification.[3]  Litton not

only failed to tender HAMP modifications to the named Plaintiffs by the close of the trial period,

it also neglected to send Plaintiffs any written decision within that timeframe.  FAC at ¶¶ 56, 68-

69 (Belyeas),[4] ¶¶ 93-94 (Botelhos), ¶ 118 (Mahan).  Instead, Plaintiffs were the targets of

redundant, ambiguous and threatening demands for documents.  FAC at ¶ 56 (Belyeas), ¶¶ 113-

114 (Mahan).  Plaintiffs have also been subjected to a range of foreclosure activity against their

homes, including improper foreclosure threats and collection actions, *see* FAC at ¶ 57 (Belyeas),

¶¶ 85, 88 (Botelhos), ¶¶ 120 (Mahan), as well as unlawful fees and charges.  FAC at ¶¶ 58-60

(Belyeas), ¶¶ 89-90 (Botelhos), ¶ 121 (Mahan).  Just as Litton threatened foreclosure against the

named Plaintiffs at various points following their trial periods, *see* FAC at ¶¶ 59 (Belyeas), 88

(Botelhos), 120 (Mahan), other similarly situated borrowers will inevitably experience

foreclosure auctions conducted at Litton's direction, purporting to sell their homes.  FAC at ¶

149.

## III.    LEGAL STANDARD

In order to survive a motion to dismiss, the complaint must contain sufficient factual

matter to state a claim to relief that is plausible on its face.  *See Bell Atl. Corp. v. Twombly*, 550

U.S. 544, 555-56 (2007).  In making this determination, the Court "must accept all well-pleaded

facts of the complaint as true and draw all reasonable inferences in favor of the plaintiff." *Moss*

---

[3] This timeframe is established by the TPP Agreement, which: defines the "Modification Effective Date" as the first day of the month following the month in which the last Trial Period Payment is due; provides that "TIME IS OF THE ESSENCE under this plan"; and requires that the borrower receive the Modification Agreement prior to the Modification Effective Date.  *See* FAC, Ex. 11 at 2.

[4] Plaintiffs note that, subsequent to the commencement of this litigation, Litton offered the Belyeas a permanent modification.  The Belyeas have responded to Litton with questions regarding its terms and the parties remain in negotiations regarding this offer.  *See* Decl. of Brian Forbes [Docket No. 18] at 1 n.2.

*v. Camp Pemigewassett*, 312 F.3d 503, 506 (1st Cir. 2002).  If the facts as pled allow the Court

to draw a reasonable inference that the Defendant is liable for alleged misconduct, the motion to

dismiss must be denied.  *Id.*  Such is the case here.

Litton's memorandum ignores the standard for dismissal under Fed. R. Civ. P. 12(b)(6),

inappropriately disputing multiple allegations of the Complaint.  Litton's repeated assertions that

none of the named Plaintiffs suffered any monetary harm and were not subjected to any unlawful

fees and costs during and after their Trial Periods, *see* Mot. at 20-21, is flatly contradicted by

facts before the Court.  *See* FAC ¶¶ 58-60 (Belyeas), ¶¶ 89-91 (Botelhos), ¶¶ 120-121 (Mahan).

## IV.    ARGUMENT

### A.    Litton Mischaracterizes Plaintiffs' Legal Position

Litton's motion misleads the Court in at least two important respects.  First, Plaintiffs

have not brought suit to enforce HAMP based on either a third-party beneficiary or a due process

claim.  The cases cited by Litton on these issues have no relevance to this matter.  *See* Mot. at 9-

11.  Nor is Litton's citation to opinions deciding whether HAMP or its enabling legislation

contain a private right of action at all useful to the Court here.  *See* Mot. at 11-12.  Rather,

Plaintiffs assert breach of contract and other claims for violations of the TPP Agreements

between themselves and Litton.

Second, Plaintiffs do not assert, as Litton suggests, that the fact that a homeowner was

offered a TPP Agreement creates an automatic entitlement to a permanent loan modification.[5]

Plaintiffs argue instead that the language of the TPP Agreement itself, together with Litton's

initial finding of HAMP eligibility on which the tender of the TPP Agreement is based, and

---

[5] For example, in circumstances where Litton issued well-founded, timely denials to homeowners on the basis of failure to comply with the terms of the TPP Agreement, Plaintiffs agree that Litton would not be required to tender permanent HAMP modifications.

Litton's failure to tender a timely denial combine to create that entitlement.

> **1.** **The HAMP Cases Litton Cites Have No Bearing on a Claim for Breach of the TPP Agreement between Litton and its Borrowers**

Not a single one of the HAMP cases cited by Litton turns on the form contract that is at the center of this dispute. Instead, the cases cited by Litton stand for one of three propositions, each of which confuses the issue. First, Litton cites opinions that have rejected claims based on due process rights stemming from an alleged property interest in a modification prior to any TPP Agreement being offered. *See, e.g., Williams v. Geithner*, No. 09-1959, 2009 WL 3757380 (D. Minn. Nov. 9, 2009). Plaintiffs do not bring that claim.[6]

Second, Litton cites cases brought on the theory that the contract *between the servicer and the Treasury Department* is intended to benefit borrowers. *See, e.g., Hoffman v. Bank of America, N.A.,* No. C-10-2171-SI, 2010 WL 2635773 (N.D. Cal. June 30, 2010). Plaintiffs here have not brought that claim either. The contracts at issue in the Complaint are altogether

---

[6] Indeed, Court's analysis in *Williams* actually supports Plaintiffs' claims. *Williams* recognized that servicers evaluate borrower eligibility prior to the offer of a TPP Agreement and that compliance with an accepted TPP Agreement mandates a permanent modification: "If the loan qualifies for a modification after consideration of all the [eligibility] factors, the servicer is obligated to provide a trial period loan modification. If the borrower remains current throughout the trial period, the servicer must then provide a loan modification." *Williams*, 2009 WL 3757380, at *3. It is this obligation that is memorialized in the TPP Agreement at issue here.

different – they are the agreements directly between the borrowers and Litton.[7]  Litton is well

aware of these distinctions because a case that it cites – and indeed, one in which it was directly

involved as servicer – produced an opinion from this Court that explicitly makes the same

distinction in connection with similar complaints.  *See McKensi v. Bank of America, N.A.,* No.

09-11940-JGD, 2010 WL 3781841, at *5-6 (D. Mass. Sept. 22, 2010).[8]  Judge Dein recognized

the distinction between claims like those here and those raised in cases asserting rights a s third-

party beneficiaries.

Third, Litton cites cases holding that HAMP and its enabling legislation do not provide

for a private right of action.  *See, e.g., Santos v. Countrywide Home Loans*, No. Civ. 2:09-02642

WBS DAD, 2009 WL 3756337 (E.D. Cal. Nov. 6, 2009); *Escobedo v. Countrywide Home*

*Loans, Inc.,* No. 09-cv-1557-BTM(BLM), 2009 WL 4981618 (S.D. Cal. Dec. 15, 2009); *Gaitan*

*v. Mortgage Elec. Registration Sys.*, No.  EDCV 09-1009-VAP, 2009 WL 3244729 (C.D. Cal.

Oct. 5, 2009).  Plaintiffs do not seek to enforce HAMP, but rather seek to enforce the bilateral

---

[7] Defendant's citations illustrate its repeated distortion of Plaintiffs' claims and mislead the Court.  Defendant relies on *Marks v. Bank of Am., N.A.*, No. 03:10-cv-08039-PHX-JAT, 2010 WL 2572988 (D. Ariz. June 22, 2010), which, like *Hoffman*, is a third-party beneficiary case where Plaintiff alleges breach of the agreement between Treasury and the Defendant, from which Plaintiff alleges she was entitled to benefit.  Defendant also cites *Pantoja v. Countrywide Home Loans, Inc.*, 640 F. Supp. 2d 1177 (N.D. Cal. 2009) and *Ung v. GMAC Mortg*, 2009 WL 2902434 (C.D. Cal. Sept. 4, 2009).  In all of these cases, the relevant claims are based on Defendants' receipt of TARP funds.  Unlike those plaintiffs, Plaintiffs' claims in this case are not based on the theory that "Defendant violated the intent and purpose of TARP."  *Pantoja*, 640 F. Supp. 2d at 1185.  To repeat, Plaintiffs do not make a third-party beneficiary claim in this case nor do they seek to enforce HAMP, as in *Marks*.  Plaintiffs' claims are not based on Defendant's receipt of TARP funds either. Plaintiffs seek to enforce the actual contract between themselves and Litton.

[8] "McKensi contends that there are cases pending in this court which raise the same issue [regarding third-party beneficiary status] but have not been dismissed.  However, the lawsuits to which plaintiff cites in support of this claim have either disavowed a third-party beneficiary theory or have not asserted one." *McKensi*, 2010 WL 3781841, at *5.

contracts that promise them Home Affordable Modification Agreements – permanent loan

modifications the terms of which happen to be established by the HAMP guidelines.

Litton's position that the lack of a private cause of action in HAMP bars this suit – which

is based in common law and Massachusetts' consumer protection statute – is misleading and

wrong.  It is clear that Plaintiffs have not brought a cause of action under HAMP because their

claims do not arise unless and until the TPP Agreement is breached.[9]  It is the contract – not

HAMP – that Plaintiffs seek to enforce.[10]  Of course, the contract was formed in the context of

Litton's participation in HAMP, and thus the program provides background necessary to

understand the terms of the TPP Agreement.  *See* Section II, *supra*.  Yet, it is black letter law that

the Court is free to look to extrinsic sources to supply a reasonable construction of an ambiguous

or missing term in a contract.  *See United States v. President and Fellows of Harvard College*,

323 F. Supp. 2d 151, 172 (D. Mass. 2004) (Court allowed extrinsic evidence to resolve the

meaning of a term in a cooperative agreement between parties).  *See also College Loan*

---

[9] The cases cited by Litton on this point are unpersuasive.  *See* Mot. at 11-13, *citing, inter alia, Brown v. First Tenn. Nat'l Ass'n, C.A. No.* 1:09-CV-0679-BBM (N.D. Ga. Nov. 20, 2009).  *Brown* is an unpublished civil RICO opinion from a foreign jurisdiction that expressly rests on narrow, case-specific facts, bound up in the "controversial" civil RICO scheme.  *See Brown* Slip Op. at 27.  Under this scheme, the court found that the guidelines cited as the basis for alleged RICO violations were not included on the "discrete list of federal statutes, the violation of which constitutes racketeering activity." *Id.* at 25.  Nothing of the sort is at issue here, where Plaintiffs bring a straightforward common law breach of contract action based on an agreement between themselves and the Defendant.

[10] Simply because the contract at issue here was made as part of a federal program, and draws on that program as the source of certain principles of the agreement, does not render it unenforceable.  Were the case otherwise, a court would not be able to enforce a contract touching on issues of federal law, where that law was devoid of a private right of action.  This is not so.  *See, e.g., Chalfin v. Beverly Enterprises, Inc.*, 741 F. Supp. 1162, 1178 (E.D. Pa. 1989) (ruling that genuine issues of material fact exist on claim for breach of nursing home resident's contract made in context of federal and state health care laws that did not contain a private cause of action).  *See also Ionco v. Jensen Constr. Co.*, 622 F.2d 1291, 1296 (8th Cir. 1980) (ruling that a state "is certainly free to look to the provisions of a federal statute for guidance in applying its longstanding common law remedies").

*Corporation v. SLM Corporation*, 396 F.3d 588, 598 (4th Cir. 2004) ("*College Loan*").

In *College Loan*, the Fourth Circuit found that the plaintiffs' reliance on the Higher Education Act ("HEA") standards to establish their breach of contract claim was not an impermissible effort to assert private right of action under HEA, where, among other things, the parties voluntarily included the HEA's federal standards in their private contract. *Id*. (noting that "the Supreme Court...has recognized that the availability of a state law claim is even *more* important in an area where no federal private right of action exists."). Likewise, it is permissible for the Court to look to HAMP guidelines in its analysis of Plaintiffs' claims.

Further, the Court is free to look to the standards laid out by HAMP as a source for determining whether Litton has acted unfairly or deceptively under G.L. c. 93A. Such a source need not be independently enforceable or contain a private right of action in order for a 93A claim to stand. *See Whitehall Co. Ltd. v. Merrimack Valley Distrib. Co., Inc.*, 56 Mass. App. Ct. 853, 858 (2002) ("*Whitehall*") ("Violation of a specific statute that does not itself permit private recovery may give rise to private claim under c. 93A if the violation amounts to an unfair method of competition or an unfair or deceptive practice independently prohibited by G.L. c. 93A, § 2, and if recovery under c. 93A is compatible with the objectives and enforcement mechanisms the underlying statute contains.")[11] Indeed, Massachusetts courts regularly look to federal sources of

---

[11] Thus, Litton's reliance on *Aleem v. Bank of America*, No. EDCV 09-01812, 2010 WL 532330 at *3, (C.D. Cal. Feb. 9, 2010) and similar cases is entirely misplaced. Mot. at 12. In *Aleem*, the court determined that the plaintiffs did not state a federal cause of action by pleading a violation of HAMP under the California Business and Professions Code – a statutory enforcement mechanism that is not at issue here. *Aleem* is clearly contradicted by Massachusetts authority, such as *Whitehall*. Further, to suggest, as Litton does, that these cases abrogate Litton's independent responsibility to meet obligations under its agreements distorts their reading beyond recognition. Such a position would free Litton to violate contracts that relate to federal law without consequence. The claim here at issue is a freestanding breach of contract – as a cause of action, it is not dependent on HAMP. That HAMP informs and provides context to the terms of the contract is of no consequence for the purposes of this analysis.

law that are not independently enforceable as a means of determining the standard governing

unfairness under G.L. c. 93A. *See Commonwealth v. Fremont Investment & Loan,* 452 Mass.

733, 744-46 & n.20 (2008) (citing, *inter alia*, an advisory letter from the Office of the

Comptroller of the Currency and a cease and desist order from the FDIC).

### 2. *Litton Distorts Plaintiffs' Position Regarding Eligibility*

The second important manner in which Litton distorts Plaintiffs' claims involves the

question of eligibility. With its characterization of Plaintiffs' position, Litton suggests that a

borrower's evaluation for HAMP remains open-ended after the TPP Agreement has been

executed by the borrower. This is not so. The Complaint describes HAMP as involving a two-

step process in which the borrower is determined eligible for HAMP based on information

collected by Litton prior to the TPP Agreement being sent. FAC ¶¶ 37-38. In other words, if a

borrower has received a TPP Agreement, he has already been determined initially eligible for the

program. FAC, Ex. 2 at 17-18; Mot. at 4.[12] That determination is subject to confirmation in the

form of the trial period, during which Litton is responsible for validating the information that it

---

[12] Litton's characterization of the timing of eligibility determinations is misleading. On page 4-5 of its brief, Litton asserts that servicers had formerly been permitted to "place a borrower on a three-month [trial period plan] before the servicer obtained the information from the borrower necessary to make a final determination as to whether the borrower was eligible for a permanent modification." *See* Mot. at 4-5. The citation for this statement is to a sentence in the Treasury Directives describing the servicer's ability to *verify* information that it has already collected prior to the TPP Agreement being offered. *See id., citing* SD 09-01 at 5, 17. Properly understood, eligibility (including the running of an NPV Test with a positive outcome and a determination of an appropriate monthly payment under the waterfall) is determined prior to Litton's tender of a TPP Agreement, and is merely verified during the trial period. *See* FAC, Ex. 2 at 5-6. "Servicers may use recent verbal financial information obtained from the borrower and any co-borrower 90 days or less from the date the servicer is determining HAMP eligibility *to assess the borrower's eligibility*. The servicer *may rely on this information to prepare and send to the borrower* a solicitation for the HAMP and *an offer of a Trial Period Plan*. . . . As an alternative, a servicer may require a borrower to submit the required documentation to *verify the borrower's eligibility and income prior to preparing a Trial Period Plan*." *Id.* (emphasis added).

used to decide eligibility if it has not already done so, and the borrower is given the opportunity

to show that it can make the estimated payments for three months.  *Id.*

If the information on which the initial decision was made is verified as accurate the

borrower is necessarily still eligible for a HAMP modification. *See* FAC, Ex. 2 at 18.[13]  If the

borrower also makes all three of her payments during the trial period, as is the case with the

named plaintiffs, then Litton is required by the TPP Agreement to tender a Home Affordable

Modification Agreement.  The contract at issue so states, *see* Section II*, supra*.  The named

plaintiffs and the putative class here consists of borrowers who made their payments under the

terms of the TPP Agreement and have received neither a Home Affordable Modification nor a

timely written denial notifying them that they failed to comply with some obligation under the

TPP Agreement.

Litton's position is that homeowners with whom it entered into a TPP Agreement on the

basis of this initial eligibility, and who made all of their payments, are not entitled to permanent

HAMP modifications because their eligibility is not confirmed until Litton says it is confirmed –

a time period that could stretch some indeterminate time into the future.[14]  This position is not

supported by the contract – the language of which provides that "TIME IS OF THE ESSENCE,"

which expressly identifies the "Modification Effective Date" as the month following the last trial

period payment, i.e., the fourth month after the TPP Agreement is signed (*see, e.g.,* FAC, Ex. 11

at 2) and which provides that the Loan Documents will not be modified "[i]f prior to the

---

[13] Even if the original qualifying information is later determined to be inaccurate by a margin of 25% or less, the same TPP Agreement may remain in effect. *See* FAC, Ex. 2 at 18.

[14] Plaintiffs note that the nature of Litton's attack is wholly inappropriate at this stage of the litigation.  Litton's distortion is based on its speculation that "not all borrowers are eligible for a permanent HAMP modification . . . ." Mot. at 9.  This speculation contradicts the factual pleading of the FAC and is a legal issue properly reserved for the merits stage of this litigation.

Modification Effective Date... the Lender determines that any of my representations in Section 1 were not true and correct *as of the date I signed this Plan* or are no longer true and correct *at any time during the Trial Period*" (s*ee, e.g., Id.* at §§ 2,  2(F) (emphasis added)).  Litton's position creates an interminable trial period, is an unreasonable reading of the TPP Agreement as a whole and would lead to unconscionable results, as indeed are now occurring.  It would allow Litton to keep borrowers in default on their loans and in indefinite limbo as to their eligibility for help.

Further, Litton's position defies basic principles of contract interpretation applicable to standard form contracts, including that words be given their plain meaning as they would be understood by the party lacking bargaining power, and that full effect be given to the document as a whole.  *Given v. Commerce Ins. Co.*, 440 Mass. 207, 209 (2003).  Here, the standard Trial Period Plan sets out a table with just three specified Trial Period Payments (Section 2) and their due dates. *See, e.g.*, Ex. 11 to FAC. There is nothing anywhere in the document indicating that Trial Period may extend beyond these three months, let alone indefinitely until a permanent modification is granted whenever the servicer gets around to it.  If Litton's interpretation were correct, the agreement could simply have stated that trial period payments will continue until a Home Affordable Modification is provided or the borrower is denied, and if one is granted, then the modification will be retroactive to the first day of the month following the month in which the last trial period is due.  It does not do so.  A borrower entering a TPP Agreement listing dates for three monthly payments and specifying that a permanent modification will be effective on the first day of the month following the month in which the last payment is due would naturally expect to receive the Home Affordable Modification Agreement before that date.  To the extent there is any ambiguity, it must be construed against the drafter.

If Litton believed that a homeowner had breached the contract by failing to comply with its terms, it was required to notify the homeowner of that fact within the trial period itself – not months later.  By failing to issue timely denials, Litton has waived its right to raise those issues now.  A party who continues to accept the benefits of the counterparty's performance of a contract is not permitted simultaneously to claim a breach thereof.  For example, in *Worldcare Clinical, Inc. v. Bracco Diagnostic, Inc*., 22 Mass. L. Rptr. 698 (Mass. Super. 2007), *affirmed*, 73 Mass. App. Ct. 1124, 901 N.E.2d 730 (Table) (2009), the court upheld the jury's finding that continuing to accept services without providing notice of deficiency and opportunity to cure as required by parties' agreement constituted a waiver of the alleged breach.  Moreover, the duty of good faith and fair dealing requires a party claiming a breach to provide notice thereof in a timely fashion. *Downer v. Whittier*, 144 Mass. 448, 451 (1887), *appeal denied* 449 Mass. 1111 (Table).  Therefore, in the context of an agreement where "TIME IS OF THE ESSENCE" Litton may not wait for some indeterminate number of months after the close of the contractual trial period to inform class members that they are not entitled to a HAMP modification.  To the extent there is any conditional language in the TPP Agreement, it is clear that the trial period exists for Litton to verify the homeowner's eligibility and offer, or deny, a Home Affordable Modification on that basis.

**B.** **Plaintiffs Have Stated a Claim for Breach of Contract**

*1.* *Plaintiffs Have Adequately Alleged Consideration*

The TPP Agreement is supported by legally sufficient consideration. The requirement of consideration is satisfied if there is either a benefit to the promisor or a detriment to the promisee. *Fall River Housing Joint Tenants Council, Inc. v. Fall River Housing Authority*, 15 Mass. App. Ct. 992, 993, 448 N.E.2d 70, 73 (1983) (citing Restatement (Second) of Contracts § 73, Cmt. b (1979)).  The adequacy of the consideration (its monetary value) is not relevant, so

long as there is some consideration.  *V. & F.W. Filoon Co. v. Whittaker Corp.*, 12 Mass. App. Ct. 932, 933, 425 N.E.2d 399, 400 (1981).

Plaintiffs have adequately alleged consideration here, both in the form of a benefit to the promisor and in the form of a detriment to the promisee.  Plaintiffs' allegations that they made payments in an amount and manner different from that required by their pre-existing loan documents and complied with the other terms of the TPP Agreements, all of which actions were requested by Litton and none of which were pre-existing legal obligations, are sufficient to establish consideration for Litton's promises to provide Home Affordable Modifications.

Compliance with the TPP Agreement results in legal detriment to the Plaintiffs of two types.  First, the borrower is required to provide extensive financial information, make binding representations concerning his or her personal circumstances and agree to undergo credit counseling.  FAC, Ex. 11 at 1.  The borrower may also be required to make payments into a newly established escrow account, if one did not already exist.  FAC, Ex. 2 at 11.  Satisfaction of these conditions was requested of Plaintiffs by Litton in the TPP Agreement, and, as discussed below, they improve Litton's position for the purposes of underwriting the modification and for ultimate payment of the loan as modified.  Before entering into the TPP Agreements, Plaintiffs had no obligation to fulfill these conditions.  Thus, they are legal detriments to the Plaintiffs – completely apart from any payment of money towards the pre-existing debt – and constitute consideration for Litton's promises to provide Home Affordable Modifications.  "[I]t is a sufficient *legal* detriment to the promisee if it promises or performs any act, regardless of how slight or inconvenient, which it is not obligated to promise or perform so long as it does so at the request of the promisor and in exchange for the promise."  Samuel Williston, *A Treatise on the Law of Contracts* §7:4 (4th ed. 2008) (emphasis in original).  *See also*, *Wit v. Commercial Hotel*

*Co.*, 253 Mass. 564, 572 (1925) ("It would be a detriment to the promisee, in a legal sense, if he, at the request of the promisor and upon the strength of that promise, had performed any act which occasioned him the slightest trouble or inconvenience, and which he was not obliged to perform.")

Second, the fact that Plaintiffs are required to make payments in specific amounts requested by Litton and differing from their prior obligation independently satisfies the requirement of consideration (and further distinguishes this case from the partial payment cases discussed below).  The TPP Agreement is an exchange of mutual promises to alter the timing and conditions of payment of a debt.  Such mutually agreed changes in performance constitute consideration:

> Performance of a legal duty owed to a promisor which is neither doubtful nor the subject of honest dispute is not consideration; *but a similar performance is consideration if it differs from what was required by the duty in a way which reflects more than a pretense of bargain*.

Restatement (Second) of Contracts § 73 (emphasis added; Williston, *supra*, §7:27 ("If a debtor does something more or different in character from that which it was legally bound to do, it will constitute consideration for the promise.")

The TPP Agreement makes clear that Plaintiffs' payments are held in accounts maintained by servicers, instead of immediately applied to their loans, making them different in character from the payments Plaintiffs were otherwise obligated to make.  FAC, Ex. 11 at 2.

Importantly, Litton requested that Plaintiffs make TPP payments instead of paying on their pre-existing loan obligations.  Thus, making the TPP payments is a legal detriment to Plaintiffs.[15]

An independent basis for finding consideration is that Litton also received a benefit from Plaintiffs' performance, by definition.  Litton performed an NPV test for each Plaintiff before offering a TPP Agreement.  Mot. at 4-5.  In order for a borrower to qualify for a HAMP modification, the NPV test must show that it is likely to be more profitable for the servicer to modify the loan than to allow the loan to go into foreclosure. Mot. at 4; FAC, Ex. 2 at 4-5.   If Litton did not expect to be benefitted by the TPP Agreements, it would not have extended them to Plaintiffs and requested Plaintiffs' compliance.

Other specific elements of Plaintiffs' performance also benefit Litton.  For instance, where borrowers are required to set up escrow accounts, Litton is benefitted because borrowers' risk of defaulting on property tax obligations is lessened, increasing the value of Litton's security interest.  Credit counseling for borrowers is similarly beneficial to Litton, since it presumably reduces the risk of default.  Borrowers' provision of detailed financial information to Litton is also beneficial, since it should allow Litton to predict with greater certainty borrowers' ability to pay and likelihood of default.  For borrowers who do not satisfy the terms of the TPP Agreement and therefore do not receive a Home Affordable Modification, this information improves

---

[15] In attempting to avoid the conclusion that making TPP Payments is a legal detriment to Plaintiffs, Defendant tries to characterize these circumstances as *beneficial* to Plaintiffs.  Mot. at 15-16.  Defendant completely ignores both the definition of "legal detriment" and the fact that Plaintiffs must pay every penny of their loan obligations and potentially more, not to mention the increased risk of foreclosure and damage to Plaintiffs' credit scores that result from the deepening arrearages.  Only if Defendant follows through on its promises and provides Plaintiffs with permanent loan modifications, will the lower payments made during the TPP period constitute a benefit to Plaintiffs.  "A promise or an act may be a detriment although *on balance* the promisor is making a good bargain. Thus a promise to pay £10,000 for a Rolls Royce worth £12,000, is nonetheless a detriment."  Black's Law Dictionary (8th ed. 2004), detriment (quoting P.S. Atiyah, *An Introduction to the Law of Contract* 101 (3d ed. 1981)).

Litton's ability to make intelligent decisions about other loss mitigation options.  A bargained-for

benefit to the promisor, even with no legal detriment to the promisee will render a bargain

enforceable.  Williston, *supra*, §7:5; *Marine Contractors Co., Inc. v. Hurley*, 365 Mass. 280

(1974) (money paid to promisor was sufficient consideration, even though it came from trust

fund rather than from promisee, and was thus not detrimental to promisee).

Defendant cites the rule that a debtor's partial payment on a debt is not consideration for

the creditor's promise to discharge the remainder of the debt.  Mot. at 16.  While this is an

accurate statement of a recognized exception to the general rule that any detriment or benefit

constitutes consideration, the pre-existing duty exception is narrow and is not applicable to the

circumstances alleged in this case:

> The foundation of the rule [that payment of a less sum is not consideration for
> relinquishing a legal right to the remainder] seems therefore to be, that in the case
> of the acceptance of a less sum of money in discharge of a debt, inasmuch as there
> is no new consideration, no benefit accruing to the creditor, and no damage to the
> debtor, the creditor may violate, with legal impunity, his promise to his debtor,
> however freely and understandingly made. This rule, which obviously may be
> urged in violation of good faith, is not to be extended beyond its precise import;
> and whenever the technical reason for its application does not exist, the rule itself
> is not to be applied.

*Brooks v. White*, 43 Mass. 283, 285 (1841).  The very case cited by Defendant to establish the

rule acknowledges its narrow applicability.  *In re Lloyd, Carr and Co.*, 617 F.2d 882, 890 (1st

Cir. 1980) ("[E]xceptions are recognized to the general rule in cases where the circumstances

indicate that the policy of deterring extortion is not applicable.").  *See also Emerson v. Deming*,

304 Mass. 478, 481 (1939) ("The application of the rule does not extend beyond the limits upon

which it is based, and if the agreement for accord and satisfaction is shown to rest upon a new

consideration, in the way of some benefit to the creditor or detriment to the debtor, then such an

agreement is valid.").

There can be no concern of extortion by the Plaintiffs in this case, who applied to participate in a large-scale loan modification program created by the U.S. Treasury in the face of a national economic crisis, and who attested to their real financial hardships. FAC at ¶¶ 47-48, 77-78, 101-102. Nor does Litton assert to the contrary. Furthermore, the TPP Agreements at issue are neither factually nor legally equivalent to the narrow circumstances in which the pre-existing duty exception applies. The TPP Agreement simply is not a promise to discharge a portion of the borrower's debt in exchange for partial payment. Neither the TPP Agreement nor the Home Affordable Modification that should follow its successful completion involves any discharge of a borrower's original indebtedness. The TPP Agreement itself provides that the borrower understands "that nothing in this Plan shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the Loan Documents." FAC, Ex. 11 at 3. Nor are the borrower's obligations under the TPP Agreement limited to paying part (or even all) of the pre-existing debt. Litton's attempt to avoid its contractual obligations by mischaracterizing the agreement as gratuitous debt forgiveness must fail.

### 2. Plaintiffs Sufficiently Allege Damages

Litton's argument that Plaintiffs have failed to state a claim for breach of contract because they fail to allege damages is likewise without foundation. In order to state a claim for breach of contract, "in general, it is sufficient to aver the making of the contract, its terms and the breach thereof." *Daddario v. City of Pittsfield*, 301 Mass. 552, 555 (1938). *See also Hacker v. Nitschke*, 310 Mass. 754, 757 (1942) (finding sufficient a count which "alleges the facts upon which an implied contract arose, and the facts constituting a breach of that contract"); *Faulkner*, 2010 WL 2472275 at *8-9 (finding plaintiffs' allegations regarding the existence and breach of a loan modification contract sufficient to defeat a motion to dismiss).

As discussed above, Plaintiffs have alleged that Litton entered into written contracts with

each of them and with each member of the proposed class. FAC at ¶¶ 50, 80, 104, 145. *See*

Section II, *supra.* It is a long established principle of Massachusetts law that "[f]or every breach

of a promise made on good consideration, the law awards some damage." *Hagan v. Riley*, 13

Gray 515, 516 (Mass. 1859). *See also Clark v. Gulesian*, 197 Mass. 492, 494 (1908); *Singarella*

*v. City of Boston*, 342 Mass. 385, 386-387 (1961). The object in determining the damages for a

breach is to put the wronged party in as good a position as if the other party fully had performed.

*See e.g. Bucholz v. Green Bros. Co.*, 272 Mass. 49, 54 (1930). Put another way, the plaintiff is

entitled to damages for harms that "flow according to common understanding as the natural and

probable consequences of the breach." *Evans v. Yegen Associates, Inc.*, 556 F. Supp. 1219, 1230

(D. Mass. 1982) (citing *Bucholz*, 272 Mass. at 54). There is no requirement of specific pleading

for damages flowing naturally from the breach. *See Sherlag* at 235. Defendant does not and

cannot cite authority to the contrary.

Had Litton timely performed under the TPP Agreements it entered into with Plaintiffs

instead of keeping them in an indeterminate limbo, Plaintiffs' would have received a Home

Affordable Modification before the end of the TPP period, altering their loan documents

effective the first day of the month following the three-month TPP period. FAC, Ex. 11 at 1, 2.

Upon modification of their loan documents, Plaintiffs no longer would have been in default of

their mortgage obligations (which they necessarily were during the trial period, even if they were

current at the start of the trial period), all existing arrearages would have been capitalized, late

fees would have been forgiven and Plaintiffs would have had affordable monthly payment

amounts going forward. FAC, Ex. 11 at 3, Ex. 2 at 9, 15, 18, 22. Each month that Litton fails to

perform its obligations under the TPP Agreements, Plaintiffs' existing loan documents remain in

full force and effect and Plaintiffs accrue greater fees and charges, are forced further into

delinquency on their mortgages, are in default for longer periods, are at heightened risk of losing their homes to foreclosure, and experience further damage to their credit.  FAC ¶¶ 156-57. These consequences are the natural result of Litton's breaches.  Plaintiffs' allegations – which set out the existence and terms of the contracts and the alleged breach – are sufficient to put Litton on notice of the damages that are the consequence of such breach, and therefore are sufficient.

Even if those allegations were not enough, Plaintiffs also have alleged damages more specifically.  Had Litton timely performed under the TPP Agreements it entered into with Plaintiffs, Plaintiffs would not have been subjected to any foreclosure-related activity during the period after their permanent modifications would have become effective (because Plaintiffs would no longer have been in default).  In addition, Litton's extension of the three-month trial period into an ongoing period of review at its discretion causes harm.  Any modification extended by Litton in a month beyond the close of the trial period will necessarily mean that the permanent modification offered will be on less favorable terms to the borrower.  FAC at ¶¶ 57-59, 89-90, 149, 156-157, 164, 168.  This is because as each month passes, interest under the original note accrues and servicers add fees and costs, including those related to foreclosure, that will be capitalized in the modified principal balance.  *Id.*  Had Litton not breached the TPP Agreement and offered the permanent modification at the close of the trial period, these costs would not have accrued.  Last, foreclosure activity constitutes independent injury.  As described above, Plaintiffs have experienced foreclosure activity ranging from improper threats to foreclosure sales.  *See supra* at 5 & n.8.[16]

---

[16] Plaintiffs also allege that they were damaged by losing opportunities to pursue other means of avoiding foreclosure.  FAC at ¶¶ 149, 157, 164.  These lost opportunities are not too speculative. *Cf. Don v. Soo Hoo*, 75 Mass. App. Ct. 80 (2009) (affirming jury award of damages for lost opportunity to obtain a bankruptcy discharge).

### 3.    *The TPP Agreements Are Complete, Enforceable Contracts*

The TPP Agreements establish the precise nature and timing of each party's obligations and leave nothing to be negotiated at a later date.  They are complete and enforceable contracts. Defendant asserts that key terms of the permanent modification that is to follow the trial period are left undetermined.  Mot. at 18-19.  As explained below, this is wrong and is directly contradicted by Defendant's own explanation of HAMP, which acknowledges that the terms of the modification are determined by using the HAMP "waterfall."  *See* Mot. at 3-4.  Furthermore, the loan modification cases cited by Litton are inapplicable, because the TPP Agreement is not itself a loan agreement, but a promise to *provide* Plaintiffs with such an agreement at a specified date, and pursuant to HAMP rules if Plaintiffs comply with the necessary conditions.  Nor is the TPP Agreement a mere "agreement to agree," since the essential terms of the promised Home Affordable Modification Agreement are not open to negotiation or discretionary alteration by either side.

The TPP Agreement makes clear that the terms of the permanent modification are to be determined using the mathematical formulas provided for in the HAMP Program Documentation.  The very first sentence of the TPP Agreement provides:

> If I am in compliance with this Trial Period Plan…, then the Lender will provide me with a Home Affordable Modification Agreement ("Modification Agreement"), as set forth in Section 3.

FAC, Ex. 11 at 1.  "Home Affordable Modification Agreement" is not generic language; the term has technical meaning, supplied by the HAMP Program Documentation.  As noted above, the Court is free to reference HAMP rules to interpret the terms of the contract.  *See supra* Section IV(A)(1), *citing College Loan.*

In this instance, the precise terms of the promised permanent modification are ascertainable by operation of these rules.  The interest rate, the term of the loan, and the principal

balance of a modified loan under HAMP are subject to the "waterfall" formula that is designed to reduce the monthly payment to 31% of the borrower's monthly gross income.  Mot. at 3-4, FAC, Ex. 2 at 8-10.  After Litton verifies that its initial finding of eligibility was correct, it works backward from the borrower's income, pursuant to this formula, in order to set each of the relevant variables. FAC, Ex. 2 at 8-10.  The formula, however, remains the same for all borrowers.  In other words, each TPP Agreement contemplates a HAMP modification, the precise terms of which are ascertainable and are not subject to negotiation between the parties.[17]

### C.    Plaintiffs Have Stated a Claim for Breach of the Covenant of Good Faith and Fair Dealing

As discussed above, Plaintiffs adequately have alleged the existence of contracts between themselves and Litton.  "Every contract implies good faith and fair dealing between the parties to it.  The covenant of good faith and fair dealing requires that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to the fruits of the contract."  *T.W. Nickerson, Inc. v. Fleet Nat. Bank*, 456 Mass. 562, 569-570 (2010) (internal quotations and citations omitted).  The "essential inquiry" when determining whether a party to a contract has breached the covenant of good faith and fair dealing is to consider whether "the challenged conduct conformed to the parties' reasonable understanding of performance obligations, as reflected in the overall spirit of the bargain."  *Speakman v. Allmerica Financial*

---

[17] Decades of Massachusetts court decisions confirm the conclusion that the TPP Agreements are complete, addressing all of the parties' duties and obligations, and therefore are enforceable contracts.  "The courts… are slow to turn a plaintiff out of court for the reason that the promise given and relied on was so vague that it can be given no effect."  *Weiner v. Pictorial Paper Package Corp.*, 303 Mass. 123 (1939).  "[T]he need for further documents does not preclude the formation of a binding agreement." *Targus Group Intern., Inc. v. Sherman*, 76 Mass. App. Ct. 421, 429 (2010).  *See also George W. Wilcox, Inc. v. Shell Eastern Petroleum Products*, 283 Mass. 383, 388 (1933) (finding that for a contract to be enforceable, the terms need only be set out "with sufficient definiteness and clarity that a court, by interpretation with the aid of existing and contemplated circumstances, may enforce it.").  The TPP Agreements contain every term necessary for compliance by each party and for enforcement by the courts in the event of a breach.

*Life Ins.*, 367 F. Supp. 2d 122, 132 (D. Mass. 2005).  The covenant is violated where there is

"evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of

imperfect performance, abuse of a power to specify terms, and interference with or failure to

cooperate in the other party's performance."  *Restatement (Second) Contracts* §205.

  The fruits of the TPP Agreement that should have flowed to Plaintiffs consisted of the

promised protection from foreclosure during the plan and a Home Affordable Modification at the

end of three months, with all arrearages capitalized, late fees forgiven and affordable payments.

FAC, Ex. 11.  In order to secure those fruits, Plaintiffs had to comply with the TPP Agreement.

*Id.*

  Litton, by its actions, has interfered with Plaintiffs' ability to secure the benefits of the

contracts in at least three ways.  First, Plaintiffs allege that Litton fails to communicate with or

adequately supervise foreclosure attorneys (FAC at ¶ 154), so that Plaintiffs are not protected

from foreclosure activity during the trial period, in either the initial three months, or when it

impermissibly extends for longer.  Although the TPP specifies that "the Lender will suspend any

scheduled foreclosure sale," FAC, Ex. 11 at 2, Litton's behavior very clearly breaches the

covenant of good faith and fair dealing.  *See, e.g., Tufankjian v. Rockland Trust Co.*, 57 Mass.

App. Ct. 173, 178-179 (2003) (finding that bank which agreed to provide financing for auto-

dealership violated the covenant by "conducting itself in a manner at odds" with borrower by,

*inter alia*, failing to complete appraisal on time and using a more expensive appraiser).

  Second, Plaintiffs allege that Litton undermines Plaintiffs' ability to satisfy the

requirement to provide income verification by failing to hire sufficient staff, by losing

documents, repeatedly requesting documents it had already received, giving conflicting and

confusing instructions to borrowers, not responding to borrowers' inquiries, and making

mistakes in processing documents.  FAC at ¶¶ 56, 87-88, 90, 114, 154, 168.  By promising

borrowers one thing without the intention and/or ability to provide it, Litton dishonestly breached

the covenant.  *FAMM Steel, Inc. v. Sovereign Bank*, 571 F.3d 93, 100 (1st Cir. 2009) ("In the

lender-borrower context, the implied covenant would require that the bank be honest in its

dealings with plaintiffs") (internal quotations omitted).[18]

Third, Litton's unjustified failure to timely provide Home Affordable Modification

Agreements or written denials makes it impossible for Plaintiffs to know what is required of

them after the end of the Trial Period, and specifically whether their continued compliance will

eventually net them the fruit of their bargain (a permanent modification, albeit late) or will

merely result in deeper financial distress.  Instead of providing them with determinations within

the time period specified in the TPP Agreement, Litton left all the Plaintiffs in limbo long after

their trial periods were over and gave them ambiguous and confusing instructions regarding how

much and when to pay, whether to expect a permanent modification and whether they would be

subject to foreclosure.  *See, e.g.* FAC at ¶¶ 73, 89-91, 115-116, 157.

Even if such actions do not breach the letter of the TPP Agreement, they are a breach of

the covenant of good faith and fair dealing. *Massachusetts v. Mylan Laboratories*, 608 F. Supp.

2d 127, 158-59 (D. Mass. 2008), *citing Speakman*, 367 F. Supp. 2d at 132 (breach of covenant

---

[18] Litton's citation of *FAMM Steel* stretches the case beyond the breaking point.  *See* Mot. at 23.
Although the borrower in *FAMM Steel* was already in default, the Court's holding centered on
the finding that it did not exhibit entitlement to the fruits of labor already earned.  *See FAMM
Steel*, 517 F.3d at 100-101, *citing F.D.I.C. v. LeBlanc,* 85 F.3d 815, 821-822 (1st Cir. 1996).  In
the case *sub judice*, although named plaintiffs are in default of a note between themselves and a
party not before the Court, they are claiming breach of the covenant of good faith and fair
dealing on the basis of a different contract – the TPP Agreement -- under which they have
performed.  Thus, Plaintiffs have been deprived the fruits of labor under this contract, which they
secured by making timely payments and otherwise complying with the TPP Agreement.

does not require breach of contract).[19]

### D. Plaintiffs Have Made Allegations Sufficient to Entitle Them to Relief Based Upon Promissory Estoppel

There are three essential elements that, if met, give rise to a claim for promissory estoppel.  There must be 1) a representation or conduct amounting to a representation intended to induce a course of conduct on the part of the person to whom the representation is made; 2) an act or omission resulting from the representation by the person to whom it was made; and 3) detriment to such person as a result of the act or omission.  *See e.g. Turnpike Motors, Inc. v. Newbury Group, Inc.*, 413 Mass. 119, 123 (1992).

Defendant's argument for dismissing Plaintiffs' promissory estoppel claim is a repetition of its contract arguments, and just as ineffectual.  Defendant asserts that Plaintiffs have not alleged consideration, damage or detriment as a result of their reliance on and performance under the TPP Agreement.  Mot. at 24-25.  As discussed in Section IV(B)(1), above, Plaintiffs payments and other performance under the TPP Agreement constitute detrimental reliance on Defendant's promises.  Detriment in the context of contract or promissory estoppel means "giving up something which immediately prior thereto the promisee was privileged to retain, or doing something or refraining from doing something which he was then privileged not to do, or to refrain from doing." *Cavanaugh v. U.S. Government*, 640 F. Supp. 437, 440 (D. Mass. 1986) (citing Williston, Contracts [3rd ed.] § 102A).  Also, Plaintiffs were damaged by their reliance, as discussed in Section IV(B)(2), *supra*.

---

[19] A claim for breach of the covenant of good faith and fair dealing does not require a showing of bad faith. *Liss v. Studeny*, 450 Mass. 473, 477 & n.3 (2008) (citing *Nile v. Nile*, 432 Mass. 390, 398-399 (2000)).

### E.       Plaintiffs State a Claim for Relief Under G.L. c. 93A

#### 1.       *Analyzed Under the Correct Standard, the Complaint Adequately Alleges Unfair and Deceptive Acts or Practices*

Litton's assertion that the Plaintiffs have failed to plead adequately a cause of action

under G.L. c. 93A is likewise wrong.   The error of Litton's position begins with its misstatement

of the standard under which courts are to identify unfair or deceptive acts.  *See* Mot. at 26

(stating that unfair or deceptive conduct "must attain a level of rascality that would raise an

eyebrow of someone inured to the rough and tumble world of commerce.")  The "level of

rascality" standard was expressly rejected by the Supreme Judicial Court fifteen years ago.  "We

view as uninstructive phrases such as 'level of rascality' and 'rancid flavor of unfairness' in

deciding questions of unfairness under G.L. c. 93A." *Massachusetts Employers Ins. Exchange v.

Propac-Mass, Inc*., 420 Mass. 39, 42-43 (1995) ("*MEIC*").  Instead, the SJC has instructed courts

to "focus on the nature of the challenged conduct and on the purpose and effect of that conduct

as the crucial factors in making a G.L. c. 93A fairness determination."  *Id.; See also States

Resources Corp. v. The Architectural Team, Inc*., 433 F.3d 73, 84-85 (1st Cir. 2005); *Incase Inc.

v. Timex Corp*., 488 F.3d 46, 57 (1st Cir. 2007) ("*Incase*").  Properly articulated, the test for

unfairness also focuses on the equities between the parties, including an examination of the

knowledge and bargaining power of the plaintiff.  *Incase*, 488 F.3d at 57; *Swanson v. Bankers

Life Co*., 389 Mass. 345, 349 (1983) ("In determining whether an act or practice is unfair, as

opposed to deceptive, we must evaluate the equities between the parties. . . . What a defendant

knew or should have known may be relevant in determining unfairness. . . . Similarly, a

plaintiff's conduct, his knowledge, and what he reasonably should have known may be factors in

determining whether an act or practice is unfair.")

Evaluated under the proper standards, Plaintiffs have successfully pled that Litton's

actions were unfair and deceptive and constitute a violation of G.L. c.93A.  Specifically,

Paragraph 167 of the Complaint itemizes the ways in which Litton's conduct violated recognized

standards of unfairness.  Chief among these allegations is Litton's contravention of 940 C.M.R. §

3.16, which prohibits conduct that runs afoul of existing statutes, rules, regulations or laws meant

for the protection of the public's health, safety or welfare, as well as conduct that is contrary to

public policy and generally recognized standards applicable to the consumer lending business.

The TPP Agreement and HAMP, as described in the Complaint, certainly fall within these

categories because HAMP is a government program specifically intended to stem the tide of

foreclosures.  FAC at ¶¶ 18-30.  As argued above, *see supra* Section IV(A)(1), the Court is

permitted to look to the TPP Agreement, as well as the context of the federal program from

which it emerged, to determine whether Litton's actions violate G.L. c. 93A.

Viewed in the light most favorable to Plaintiffs, and accepting the allegations of the

Complaint as true, there can be no doubt that Litton's actions violate Chapter 93A.  The equities

between the parties heavily weigh in favor of Plaintiffs, who are individual homeowners faced

with the very real prospect of losing their homes.  The effect of Litton's conduct in failing to

keep its promises is to place Plaintiffs who have complied with the TPP Agreement in a

terrifying limbo. Moreover, Litton's conduct is alleged to be deceptive because it reasonably can

be found to have caused the Plaintiffs to act differently than they otherwise would have acted.

*Grossman v. Waltham Chem. Co.*, 14 Mass. App. Ct. 932, 933 (1982).  Here, Litton's conduct

misled Plaintiffs into believing that their compliance with the TPP Agreement would result in a

permanent loan modification within three months.  As alleged in the Complaint, these

representations caused Plaintiffs to change course.  FAC ¶ 168(f).

Litton's claim that Plaintiffs have failed to plead injury or causation is likewise without

merit.  Paragraphs 149, 157, 164 and 168 of the Complaint each detail specific injuries suffered by Plaintiffs, including: wrongful foreclosures; less favorable loan modifications because a permanent modification under HAMP after the end of the trial period includes the capitalization of interest, fees and costs that would not have been present in a timely modification); increased fees and other costs to avoid or attempt to avoid foreclosure, as in the case of all Plaintiffs; loss of savings in fruitless attempts to secure loan modifications, as in the case of the Belyeas; loss of opportunities to pursue other refinancing or loss mitigation strategies; and significant stress and emotional distress.  That Litton questions the existence of these damages does not change the fact that they have been well-pled.

Plaintiffs have also adequately alleged the Litton violated specific regulations promulgated pursuant to G.L. c. 93A.  The TPP Agreement promises that the Lender will "suspend any scheduled foreclosure sale."  *See*, *e.g.*, FAC, Ex. 11 § 2, 2(B).  This is a "promis[e of] assistance in connection with... avoiding or delaying actual or anticipated foreclosure proceedings concerning residential property"  within the meaning of 940 C.M.R. § 25.01 and is therefore a "Foreclosure-related Service."  Similarly, the TPP Agreement as a whole is also a promise of assistance "in connection with... curing or otherwise addressing a default or failure to timely pay, with respect to a residential mortgage loan obligation" *Id*.  Litton thus violated § 25.03 by, *inter alia*, offering TPP Agreements that promise suspension of foreclosure sales as well as permanent modifications by a certain date if borrowers comply with conditions therein, where Litton apparently intended to apply other, ongoing tests of eligibility not "disclosed, clearly and conspicuously" (940 C.M.R. § 25.03(c)) to the borrower in the TPP Agreement.

As to 940 C.M.R. § 8.03, there is no case law in Massachusetts addressing the question of whether an entity making a loan modification that alters the loan documents (as a Home

Affordable Modification would do) qualifies as a Mortgage Lender for purposes of 940 C.M.R. §

8.06.  Certainly, in evaluating Plaintiffs' HAMP applications, Litton is engaged in the activities

typically associated with mortgage lending – it is gathering information on property valuation

and borrower finances, calculating loan terms, making an underwriting decision and issuing

binding mortgages and notes.  In fact, Litton identifies itself as a "Lender" throughout the TPP

Agreement.  Assuming that § 8.06 is applicable to Litton, Plaintiffs have adequately alleged that

Litton has made misrepresentations regarding "the availability, terms, conditions, or charges,

incident to the mortgage transaction."  Among other things, Litton made such misrepresentations

by offering TPP Agreements that promise permanent modifications by a certain date if borrowers

comply with conditions therein, where Litton apparently intended to apply other, ongoing tests of

eligibility.

## V.   CONCLUSION

For the reasons stated above, the Court should deny Litton's motion to dismiss the

Complaint.

<div style="margin-left:50%">

Respectfully Submitted,
On behalf of the Plaintiffs,

*/s/ Gary Klein*
Gary Klein (BBO 560769)
Shennan Kavanagh (BBO 655174)
Kevin Costello (BBO 669100)
RODDY KLEIN & RYAN
727 Atlantic Avenue
Boston, MA  02111-2810
Tel:  (617) 357-5500
Fax:  (617) 357-5030

Stuart Rossman (BBO 430640)
Charles Delbaum (BBO 543225)
NATIONAL CONSUMER LAW CENTER
7 Winthrop Square, 4th floor
Boston, MA 02110
(617) 542-8010 (*telephone*)

</div>

(617) 542-8028 *(fax)*

Michael Raabe (BBO 546107)
NEIGHBORHOOD LEGAL SERVICES
170 Common Street, Suite 300
Lawrence, MA 01840
Tel:  (978) 686-6900
Fax:  (978) 685-2933

DATE: November 2, 2010

## Certificate of Service

I hereby certify that this document filed through the ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic File (NEF)

and paper copies will be sent to those indicated as non-registered participants on November 2,

2010.

*/s/ Gary Klein*
Gary Klein