UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|                              |   |                                |
|------------------------------|---|--------------------------------|
| Carol and Bruce Belyea,      ) |   |                                |
| Lucille and Wayne Botelho,   ) |   |                                |
| and Chardon Mahan,           ) |   |                                |
|                              ) |   |                                |
| Plaintiffs,                  ) |   |                                |
|                              ) |   |                                |
| v.                           ) |   | Civil Action No. 10-10931-DJC  |
|                              ) |   |                                |
| Litton Loan Servicing, LLP,  ) |   |                                |
|                              ) |   |                                |
| Defendant.                   ) |   |                                |

**MEMORANDUM AND ORDER**

**CASPER, J.**                                                    July 15, 2011

**I. Introduction**

Plaintiffs Carol and Bruce Belyea, Lucille and Wayne Botelho, and Chardon Mahan are all homeowners whose home mortgages were serviced by Defendant Litton Loan Servicing, LLP ("Litton"). Seeking to modify their mortgage payments, the Belyeas, the Botelhos, and Mr. Mahan each entered into a standardized Trial Period Plan Agreement ("TPP Agreement") with Litton. Plaintiffs contend that the TPP Agreements constitute binding contracts with Litton and that Litton failed to satisfy its contractual obligations. Both on their own behalf and on behalf of a purported class of homeowners who signed similar TPP Agreements with Litton, Plaintiffs assert four state-law claims against Litton: breach of contract, breach of the implied covenant of good faith and fair dealing, promissory estoppel, and violation of the Massachusetts Consumer Protection Act, Mass. G. L. c. 93A.

Litton has moved to dismiss Plaintiffs' amended complaint in its entirety pursuant to Fed. R. Civ. P. 12(b)(6). For the reasons discussed below, Litton's motion is DENIED.

1

**II. Burden of Proof and Standard of Review**

Whether a complaint should survive a motion to dismiss depends upon whether the pleading satisfies the "plausibility" standard. Ashcroft v. Iqbal, 129 S.Ct. 1937 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007). The First Circuit has recently addressed the principles a district court should follow when considering a motion to dismiss. As Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 8-9 (1st Cir. 2011) (applying Iqbal and Twombly), makes clear, dismissal of a complaint pursuant to Rule 12(b)(6) is inappropriate if the complaint satisfies the two-pronged requirement in Rule 8(a)(2) of "a short and plain statement of the claim showing that the pleader is entitled to relief." Id. at 8 (citing Fed. R. Civ. P. 8(a)(2)). As to the first prong, a "short and plain" statement "needs only enough detail to provide a defendant with 'fair notice of what the . . . claim is and the grounds upon which it rests.'" Id. (quoting Twombly, 550 U.S. at 555). However, in order to satisfy the second prong of showing an entitlement to relief, "a complaint must contain enough factual material 'to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact).'" Id. (quoting Twombly, 550 U.S. at 555). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Id. (quoting Iqbal, 129 S. Ct. at 1949). "In short, an adequate complaint must provide fair notice to the defendants and state a facially plausible legal claim." Id.

"In resolving a motion to dismiss, a court should employ a two-step approach." Ocasio-Hernández, 640 F.3d at 9. "It should begin by identifying and disregarding statements in the complaint that merely offer 'legal conclusion[s] couched as . . . fact[]' or '[t]hreadbare recitals of the elements of a cause of action.'" Id. (quoting Iqbal, 129 S.Ct. at 1949). "A plaintiff is not entitled to 'proceed perforce' by virtue of allegations that merely parrot the elements of the cause

2

of action." Id. On the other hand, "[n]on-conclusory factual allegations in the complaint must be treated as true, even if the allegations seem incredible." Id. "If that factual content, so taken, 'allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged,' the claim has facial plausibility." Id. (quoting Iqbal, 129 S.Ct. at 1949). "The make-or-break standard . . . is that the combined allegations, taken as true, must state a plausible, not a merely conceivable, case for relief." Id. (quoting Sepúlveda-Villarini v. Dep't. of Educ. of P.R., 628 F.3d 25, 29 (1st Cir. 2010) (Souter, J.)). "Although evaluating the plausibility of a legal claim requires the reviewing court to draw on its judicial experience and common sense, the court may not disregard properly pled factual allegations, even if it strikes a savvy judge that actual proof of those facts is improbable." Id. (citations and quotations omitted). "Nor may a court attempt to forecast a plaintiff's likelihood of success on the merits; 'a well-pleaded complaint may proceed even if a recovery is very remote and unlikely.'" Id. (quoting Twombly, 550 U.S. at 556). "The relevant inquiry focuses on the reasonableness of the inference of liability that the plaintiff is asking the court to draw from the facts alleged in the complaint." Id.

**III. Factual Background**

The following facts are alleged in the complaint and are taken as true for the purposes of this motion. Purportedly factual allegations in the complaint that are mere legal conclusions couched as fact or threadbare recitals of the elements of a legal cause of action have been disregarded by the Court and are not included in the following factual summary. Ocasio-Hernández, 640 F.3d at 9.

**A. The Home Affordable Mortgage Program**

In February 2009, faced with a nationwide foreclosure crisis, the Secretary of the Treasury and the Director of the Federal Housing Finance Agency exercised their authority under the Emergency Economic Stabilization Act, the American Recovery and Reinvestment Act, and the

Troubled Asset Relief Program, 12 U.S.C. §§ 5201-5253, and created the "Home Affordable Mortgage Program" ("HAMP"). HAMP is "a national [home mortgage] modification program aimed at helping 3 to 4 million at-risk homeowners - both those who are in default and those who are at imminent risk of default - by reducing monthly payments to sustainable levels" by restructuring the mortgages, without discharging any of the underlying debt. Am. Compl., Ex. 2, Supplemental Directive 09–01 ("SD 09–01") at 1. HAMP was designed to create a "uniform loan modification process," governed by federal standards, that could be used by any loan servicer that voluntarily opted to participate. Id. As an incentive for servicers to participate in HAMP, the federal government awards servicers three annual $1,000 payments for each permanent mortgage loan successfully modified pursuant to HAMP. Id. at 23.

A HAMP modification consists of two stages. First, the loan servicer gathers financial information about a homeowner and the homeowner's mortgage to determine whether the mortgage appears to be HAMP-eligible. SD 09-01 at 2-12. If it is, the servicer offers the homeowner a Trial Period Plan, id. at 17, which consists of a three-month period in which the homeowner makes three monthly mortgage payments in an amount determined by a fixed process known as the "waterfall," id. at 8-10, and submits additional financial information to the lender to facilitate verifying whether the homeowner is in fact HAMP-eligible. Id. at 10-12. The homeowner is also required to open an escrow account and may be required to undergo credit counseling. The trial period is governed by a form TPP Agreement, which is discussed further below.

Second, if the homeowner complies with the terms of the TPP Agreement and the servicer verifies the homeowner's income representations, HAMP's governing documents direct the servicer to offer the homeowner a permanent modification at the end of the three-month period. SD 09-01

4

at 17–18.[1]

**B. The TPP Agreement**

Multiple courts in this district have noted that a TPP Agreement "has the appearances of a contract." Durmic v. J.P. Morgan Chase Bank, N.A., 10-CV-10380-RGS, 2010 WL 4825632, at *1 (D. Mass. Nov. 24, 2010); Bosque v. Wells Fargo Bank N.A., 762 F.Supp.2d 342, 348 (D. Mass. 2011) (quoting Durmic). The TPP Agreement "characterizes itself as an agreement, contains signature lines for the Lender and the Borrower and includes distinctly contractual phrases such as 'under seal' and 'time is of the essence.'" Durmic, 2010 WL 4825632 at *1 n.4; Bosque, 762 F.Supp.2d 348 n.8 (quoting Durmic). The first sentence of each of the TPP Agreements in this case provides:

> If I am in compliance with this Trial Period Plan and my representations in Section 1 continue to be true in all material respects, then the Lender will provide me with a Home Affordable Modification Agreement, as set forth in Section 3, that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage.

Am. Compl., Ex. 7, Belyea TPP Agreement at 1. Four sentences later, the TPP Agreement states, "I understand that after I sign and return two copies of this Plan to the Lender, the Lender will send me a signed copy of the Plan if I qualify for the Offer or will send me written notice that I do not qualify for the Offer." Id.

Section 2 of the TPP Agreement sets forth the amount and date of each monthly payment, and states that "TIME IS OF THE ESSENCE under this Plan." Id. ¶¶ 2, 2(A). It next details three conditions under which the TPP would not result in a permanent modification: if, prior to the Modification Effective Date, (1) the Lender does not provide the borrower with a fully executed

---

[1] For a more thorough discussion of HAMP, see Bosque v. Wells Fargo Bank, N.A., 762 F.Supp.2d 342, 346-48 (D. Mass. 2011); Morris v. BAC Home Loans Servicing, L.P., 10-CV-11572-PBS, 2011 WL 1226974, at *4-*6 (D. Mass. April 4, 2011).

copy of the plan and permanent modification agreement, or (2) the borrower does not make all payments provided under the plan, or (3) the financial representations made in the eligibility assessment stage are no longer correct. Id. ¶ 2(F).

Section 3 explains how the permanent loan modification will be calculated. It then provides:

> If I comply with the requirements in Section 2 and my representations in Section 1 continue to be true in all material respects, the Lender will send me a Modification Agreement for my signature which will modify my Loan Documents as necessary to reflect this new payment amount . . . .

Id. ¶ 3.

### C. The Belyeas

Carol and Bruce Belyea have owned their home in Roslindale, Massachusetts since 2001. Litton has been their mortgage servicer since October 2008. The Belyeas had difficulty making their mortgage payments, and applied to Litton for a HAMP modification in August 2009. Litton offered the Belyeas a TPP Agreement that same month, with payments due in October, November, and December of 2009. The Belyeas accepted the offer, executed the TPP Agreement, returned the executed TPP Agreement along with supporting financial documentation, and timely made all three modified monthly payments as dictated by the TPP Agreement.

Despite the Belyeas' performance, in December 2009 Litton informed the Belyeas that it would not provide them with a permanent loan modification. Litton stated that its decision was made because it had not received "the additional required information," although the Belyeas had provided all documentation requested of them and Litton had not indicated that any of the information submitted by the Belyeas was incorrect, incomplete or inconsistent with the information that led Litton to offer the Belyeas a TPP Agreement in the first place.

In January 2010, a Litton employee told Carol Belyea on the telephone that the Belyeas must

send over $7,500 - purportedly the difference between the TPP payments and the full payments due for those months, the scheduled January payment and accrued late charges and other fees - by April 2010 or Litton would begin foreclosure proceedings. The Belyeas withdrew approximately $12,000 from Bruce Belyea's retirement account to pay the amount purportedly owed to Litton and to put aside $3,600 in order to cover the early withdrawal tax penalty. The Belyeas also made their full, unadjusted monthly mortgage payment in February 2010.

Litton then tendered the Belyeas a second TPP Agreement, with a trial period running from April 2010 until June 2010. Again, the Belyeas accepted the offer, executed the TPP Agreement, returned the executed TPP Agreement along with supporting financial documentation and timely made their first of three modified monthly payments as dictated by the TPP Agreement. At the end of this three-month period, Litton again failed to either provide the Belyeas with a permanent modification or to indicate that any of the information submitted by the Belyeas was incorrect, incomplete or inconsistent with the information that led Litton to offer the Belyeas a TPP Agreement in the first place.

**D. The Botelhos**

Lucille and Wayne Botelho have owned their home in Fairhaven, Massachusetts since 1998. Litton became their mortgage servicer at some point during or before June 2008. The Botelhos had difficulty making their mortgage payments and their mortgage was in default as of June 2008. The Botelhos applied to Litton for a HAMP modification in June 2009. Litton offered the Botelhos a TPP Agreement in July 2009 with payments due in September, October, and November of 2009. The Botelhos accepted the offer, executed the TPP Agreement, returned the executed TPP Agreement along with supporting financial documentation and timely made their three modified monthly payments as dictated by the TPP Agreement.

7

Despite the Botelhos' performance, Litton informed them in October 2009 that it would not provide them with a permanent modification. Litton stated that its decision was made because the Botelhos had too much income to qualify for a modification. The Botelhos believe that Litton's decision was based on a mistaken accounting of their income. When the Botelhos asked Litton to correct the alleged error, Litton did not offer the Botelhos a permanent modification, but instead notified them that they had to make up the difference between their modified TPP payments and their original payments or their home would be put into foreclosure. Litton continued to accept the modified monthly payment submitted by the Botelhos. Litton never indicated that any of the information submitted by the Botelhos was incorrect, incomplete or inconsistent with the information that led Litton to offer the Botelhos a TPP Agreement in the first place.

In January 2010, Litton offered the Botelhos a second TPP Agreement with payments due in February, March and April 2010. The modified payments under the proposed TPP Agreement were significantly higher than the modified payments under the initial TPP Agreement. The Botelhos called Litton to ask for an explanation of the higher payment amount, but no explanation was forthcoming. The Botelhos decided not to execute the second TPP Agreement.

In March 2010 and again in April 2010, the Botelhos attempted to cure their arrearage to Litton by making an unusually large mortgage payment. Litton accepted the March 2010 payment but rejected the April 2010 payment.

**E. Mr. Mahan**

Chardon Mahan has owned his home in Marshfield, Massachusetts for over a decade. Litton became Mr. Mahan's mortgage servicer in July 2008. Mr. Mahan had difficulty making his mortgage payments. In August 2009, Litton sent Mr. Mahan an unsolicited application for a HAMP modification. Mr. Mahan completed the application and returned it to Litton in September 2009.

Litton offered Mr. Mahan a TPP Agreement in October 2009, with payments due in December 2009 and January and February 2010. Mr. Mahan accepted the offer, executed the TPP Agreement, returned the executed TPP Agreement along with supporting financial documentation and timely made the first of his three modified monthly payments as dictated by the TPP Agreement.

Six days after Mr. Mahan sent in his executed TPP Agreement and his first modified payment, Litton sent Mr. Mahan an identical TPP Agreement. Mr. Mahan again accepted the offer, executed the TPP Agreement, returned the executed TPP Agreement along with supporting financial documentation, and timely made the first of his three modified monthly payments as dictated by the TPP Agreement. Mr. Mahan timely made the January 2010 and February 2010 modified payments indicated in both of his TPP Agreements.

In February 2010, counsel for Mr. Mahan contacted Litton to clarify why Mr. Mahan had been sent duplicate TPP Agreements. Litton responded by asking for financial documentation from Mr. Mahan - specifically, for the same documents that Mr. Mahan had submitted three times (once with his HAMP application and once with each of his two TPP Agreements). Mr. Mahan described Litton's repeated requests for documentation as "redundant and ambiguous and threatening," but he nonetheless provided the documents to Litton for a fourth time. Am. Compl. at ¶ 113. Even though Mr. Mahan had already made three payments under his TPP Agreement, Litton neither provided Mr. Mahan with a permanent modification nor informed him that the information he repeatedly submitted was incorrect, incomplete or inconsistent with the information that led Litton to offer him a TPP Agreement in the first place.

Mr. Mahan continued to make modified payments to Litton in March, April and May 2010. During this time, Mr. Mahan's counsel made repeated calls to Litton to check on the status of his permanent modification, and a Litton employee told counsel that Mr. Mahan's modification "looked

good" and "should be approved soon." Am. Compl. at ¶ 116.

Despite these assurances, on May 24, 2010, Litton notified Mr. Mahan that he did not qualify for a permanent modification. Three days later, on May 27, 2010, Litton sent Mr. Mahan a Notice of Default and Intent to Accelerate, despite the fact that Mr. Mahan had never missed a monthly mortgage payment, based on the difference between the modified payments Mr. Mahan had made between December 2009 and May 2010 and the amount of Mr. Mahan's unmodified, pre-TPP Agreement payments. In June and July of 2010, Litton continued to threaten Mr. Mahan with collection actions.

In September 2010, Litton sent three letters to Mr. Mahan. The first, dated September 7, informed him that Litton would not offer him a permanent loan modification. The second and third letters, dated September 23 and September 24, respectively, arrived in the same package on September 30. The letter dated September 23 indicated that Mr. Mahan's application for a HAMP modification was rejected on the purported basis that he had not provided requested documents to Litton; the letter dated September 24 solicits a new HAMP application from Mr. Mahan.

All the Plaintiffs assert that had Litton not found them eligible for HAMP and offered them TPP Agreements, they would have pursued other avenues of addressing their difficulties in paying their mortgages. Further, they allege that they have been "living in a state of limbo and stressful anxiety, without any assurances that their home[s] will not be foreclosed, despite their compliance with the TPP Agreement[s]." Am. Compl. at ¶¶ 73, 97, 126.

### F. Class Allegations

Plaintiffs purport to represent their own interests as well as "all Massachusetts homeowners whose loans have been serviced by [Litton] and who, since August 18, 2009, have complied with

their obligations under a written TPP Agreement, but have not received a permanent HAMP modification." Am. Compl. at ¶ 128.

## IV. Procedural History

Plaintiffs filed their original complaint in this action on June 4, 2010, and the case was assigned to Judge O'Toole. Plaintiffs filed a superseding amended complaint on October 1, 2010, which asserts four state law claims against Litton: breach of contract, breach of the implied covenant of good faith and fair dealing, promissory estoppel (as an alternative theory of liability), and violation of the Massachusetts Consumer Protection Act, Mass. G. L. c. 93A. Litton then filed the instant motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). The case was reassigned from Judge O'Toole to this session on January 31, 2011. On February 9, 2011, the Plaintiffs moved for expedited limited discovery regarding putative class information. The Court denied the motion without prejudice to renew and agreed to hold a hearing on Litton's motion to dismiss. Accordingly, the Court held a hearing on the instant motion on April 6, 2011.[2]

## V. Discussion

### A. Standing / Federal Claim vs. State Claims

Litton argues that "Plaintiffs' claims flow from Litton's perceived failure to meet its obligations under HAMP," Def. Memo. at 12, and asserts that, since HAMP does not create a private right of action, Plaintiffs lack standing. Litton concedes that the claims set forth in the complaint are state-law claims, not claims under HAMP or any other federal law, but argues that "Plaintiffs cannot enforce HAMP under the guise of Massachusetts law." Def. Memo. at 11.

---

[2] Both before and after the April 6 hearing, the parties continued to file statements of supplemental authority with the Court. Eight separate filings were received by the Court, beginning on the day the case was transferred from Judge O'Toole to this session and continuing up to the most recent filing, on June 8, 2011.

As noted in a similar case, "[w]hether HAMP creates a private right of action is not the issue in this case." Bosque, 762 F.Supp.2d at 350; Durmic, 2010 WL 4825632 at *2 n.9 (noting that "[i]t is the TPP contract - not HAMP - that Plaintiffs seek to enforce").[3] Here, as in Bosque and Durmic, Plaintiffs' claims rest on the theory that the TPP Agreements entered into by Litton and the Plaintiffs constitute binding contracts and that Litton breached those contracts. Accordingly, the Plaintiffs' claims arise exclusively under state contract law and related state law doctrines, not under HAMP or any other federal law. Accord Bosque, 762 F.Supp.2d at 350-51. Neither "[t]he fact that a TPP has a relationship to a federal statute and regulations" nor "the fact that the TPP is a form contract created by the government" changes the analysis; "[i]f the TPP is properly construed as a contract between the parties in this case, then [P]laintiffs have standing to bring suit in order to recover for any breach of that contract." Bosque, 762 F.Supp.2d at 351.[4]

**B. Breach of Contract**

Under Massachusetts law, the essential elements of a contract are an offer, acceptance, and

---

[3]Accordingly, the many out-of-circuit authorities cited by Litton are inapposite to the extent they turn on the conclusion that HAMP does not provide a private right of action. See, e.g., Lund v. CitiMortgage, Inc., 2:10-CV-1167-TS, 2011 WL 1873690, at *2-*3 (D. Utah May 17, 2011); Torres v. Litton Loan Servicing LP, 1:10-CV-01709-OWW-SKO, 2011 WL 149833 (E.D. Cal. Jan. 18, 2011). Similarly inapposite are Litton's arguments, raised both in its briefs and repeatedly at oral argument, that the Plaintiffs fail to allege in their complaint that they are eligible for HAMP loans. As discussed below, Plaintiffs allege that they were entitled to certain contractual benefits guaranteed by their TPP Agreements and that is all they need allege at this juncture.

[4]Litton argues that allowing the state law claims raised in this case to proceed would reduce the effectiveness of HAMP since "a servicer's voluntary participation in HAMP would be severely discouraged if the servicer were exposed to multiple private causes of action for failing to comply with HAMP requirements." Def. Memo. at 15. The argument is misplaced. As discussed above, Plaintiffs' claims in this case turn not on whether Litton "fail[ed] to comply with HAMP requirements" *per se* but on whether Litton failed to comply with its contractual obligations under state law.

an exchange of consideration or meeting of the minds. Vadnais v. NSK Steering Sys. Am., Inc., 675 F.Supp.2d 205, 207 (D. Mass. 2009) (citing Quinn v. State Ethics Comm'n, 401 Mass. 210, 216 (1987)). Litton argues that these elements cannot be established in this case as a matter of law.

Litton first argues that the TPP Agreements it sent to the Plaintiffs should not be construed as enforceable offers. A party makes an offer when it manifests "a willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." Bourque v. FDIC, 42 F.3d 704, 709 (1st Cir.1994) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 24, at 71 (1981)). The Court in Bosque, faced with an argument similar to the one Litton presents here, concluded that:

> it is plain that the TPPs were offers, and that [P]laintiffs' signatures and subsequent monthly payments under the terms of the TPP constituted acceptance of those offers. The TPP denotes the terms and duties that each party must perform under the bargain. In capital letters, it alerts the parties that "time is of the essence" for performance under the terms of the offer. Through its signature line and detailed description of the dates and manner by which the borrower submits monthly payments, the TPP indicates a straightforward method of acceptance. Indeed, the HAMP guidelines refer to the TPP as an "offer" and the monthly payments under it as "contractual payment[s]." SD 09–01, at 15 ("The servicer may, in its discretion, consider the offer of a Trial Period Plan to have expired at the end of 60 days if the borrower has not submitted both an executed Trial Period Plan and complete documentation as require under the Trial Period Plan."); id. at 18 ("Note that under the terms of the Agreement, trial payments should be applied when they equal a full contractual payment (determined as of the time the HAMP is offered).").

Bosque, 762 F.Supp.2d at 351. The relevant factual allegations are akin to those in this case, see Am. Compl. at ¶¶ 51-54, 81-84, 105-08 and Exs. 8, 10 and 11 (Plaintiffs' TPP Agreements denote the terms and duties Plaintiffs and Litton must perform); ¶¶ 53, 83, 107 and Ex. 8 at 3, Ex. 10 at 3, Ex. 11 at 3 ("time is of the essence" written in capital letters in the TPP Agreements provided to Plaintiffs); ¶¶ 36-38 (discussion in Amended Complaint of the relationship between TPP and HAMP as set forth in SD 09-01), and the Court finds the analysis in Bosque on this issue persuasive.

13

Litton next argues that, even its proffer of TPP Agreements to the Plaintiffs constitutes a legally enforceable offer, Plaintiffs' acceptance of the offer was not accompanied by consideration. "A contract must have consideration to be enforceable and in order for a contract to have valid consideration, the contract must be a bargained-for exchange in which there is a legal detriment of the promisee or a corresponding benefit to the promisor." Neuhoff v. Marvin Lumber and Cedar Co., 370 F.3d 197, 201 (1st Cir. 2004) (internal quotation omitted). Invoking the "pre-existing duty" rule, see In re Lloyd, Carr & Co., 617 F.2d 882, 890 (1st Cir. 1980); First Nat'l Bank of Boston v. Cartoni, 295 Mass. 75, 75-76 (1936), Litton asserts that because the modified monthly mortgage payments each Plaintiffs made under his or her TPP Agreement went towards satisfying the Plaintiff's undisputed pre-existing duty to pay off his or her mortgage in its entirety, the TPP payments cannot constitute new bargained-for consideration.

Litton is correct that modified mortgage payments, standing alone, would likely not constitute cognizable consideration under the TPP Agreements at issue. Bosque, 762 F.Supp.2d at 352. However, the TPP Agreements required homeowner not only to submit modified mortgage payments, but also "to provide documentation of their current income, make legal representations about their personal circumstances, and agree to undergo credit counseling if requested to do so . . . . Plaintiffs could also be required to make payments into a newly established escrow account." Id. (quoting Durmic, 2010 WL 4825632, at *3) (both cases referring to TPP provisions identical to those at issue in this case). These all constitute new legal detriments to plaintiffs that flowed from their acceptance of Litton's proffered TPP Agreements. Id. (citing Wit v. Commercial Hotel Co., 253 Mass. 564, 572 (1925)); see also Calfee v. CitiMortgage, Inc., 1:10-cv-12051-WGY, Docket #23 (D. Mass. Mar. 12, 2011) (ruling from the bench denying a motion to dismiss brought on the

14

ground that a TPP Agreement was not a contract because homeowner provided insufficient consideration to the servicer). Accordingly, Plaintiffs' amended complaint plausibly alleges that the TPP Agreements are supported by consideration.

Next, Litton argues that the TPP Agreements lack "definite" and "essential" terms and thus cannot be treated as an enforceable contract, because it does not specify the terms—such as repayment dates, the amount to be repaid, and the interest rate—for a permanent loan modification. "A purported contract which is no more than an agreement to agree in the future on essential terms, or one which does not adequately specify essential terms, ordinarily will be unenforceable." Giuliano v. Nations Title, 134 F.3d 361 (Table), 1998 WL 45459, at *4 (1st Cir. Jan. 23, 1998) (unpublished) (quoting Air Tech. Corp. v. Gen. Elec. Co., 347 Mass. 613, 626 (1964)). But at this point the Plaintiffs need not rely solely on their argument that the TPP Agreement is a contract for a permanent loan modification; they also argue that the TPP Agreement is a contract governing each party's conduct in the three-month trial period, under which the Plaintiffs are obliged to provide specific financial information and make payments in a specific amount and Litton is specifically obligated to provide by the modification effective date stated in the TPP Agreement either (1) a permanent loan modification or (2) a decision that plaintiffs are not entitled to permanent modification. "At a minimum, then, the TPP contains all essential and material terms necessary to govern the trial period repayments and the parties' related obligations." Bosque, 762 F.Supp.2d at 352. Litton's arguments regarding essential terms are better directed to the distinct question of "[w]hether . . . the TPP [Agreement] obligates servicers to provide borrowers who are in compliance with a permanent loan modification or merely a decision on a permanent loan modification," which, as Bosque prudentially concluded, "is an issue better resolved at a later stage of the proceedings."

Id. as 352 n.7. The essential terms in the TPP Agreement governing the trial period are clearly specific enough to defeat a motion to dismiss.[5]

Litton's final argument is that the Plaintiffs have not alleged that they were injured by Litton's conduct and, therefore, have not alleged a basis for the Court to award damages. The Court disagrees, as the amended complaint does allege damages, both in terms of accrued of fees and charges in the period during which Litton allegedly should have tendered a permanent loan modification or at least a decision, and in terms of relief foregone by the Plaintiffs during that same period. Am. Compl. at ¶ 149.

Plaintiff's amended complaint plausibly alleges the elements of a state law breach of contract claim against Litton, and, accordingly, the claim is sufficient to survive Litton's motion to dismiss.

### C. Breach of the Implied Covenant of Good Faith and Fair Dealing

"Every contract implies good faith and fair dealing between the parties to it. The covenant of good faith and fair dealing requires that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to its fruits of the contract." T.W. Nickerson, Inc. v. Fleet Nat'l Bank, 456 Mass. 562, 569–70 (2010) (quoting Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 471 (1991)). To demonstrate a breach of this covenant, a plaintiff must show that the allegedly breaching party "acted with . . . dishonest purpose or conscious wrongdoing necessary for a finding of bad faith or unfair dealing." Schultz v. R.I. Hosp. Trust Nat'l Bank, N.A., 94 F.3d 721, 730 (1st Cir. 1996). The key inquiry is whether "the challenged conduct conformed

---

[5]The various out-of-circuit cases cited by Litton that reach a contrary conclusion are less persuasive than the analysis shared by the growing chorus of cases in this district consistent with Durmic and Bosque. See, e.g., In re Bank of Am. Home Affordable Modification Program (HAMP) Contract Litigation, 10-MD-02913-RWZ, 2011 WL 2637222, at *3-*4 (D. Mass. July 6, 2011); Stagikas v. Saxon Mortg. Servs., Inc., 10-CV-40164-FDS, 2011 WL 2652445, at *4-*5 (D. Mass. July 5, 2011); Calfee, 1:10-cv-12051-WGY, Docket #23 (D. Mass. Mar. 12, 2011).

to the parties' reasonable understanding of performance obligation, as reflected in the overall spirit of the bargain." Speakman v. Allmerica Fin. Life Ins., 367 F.Supp.2d 122, 132 (D. Mass. 2005).

Plaintiffs assert that the fruits they were entitled to under their TPP Agreements include "protection from foreclosure during the plan and a [permanent mortgage m]odification at the end of three months, with all arrearages capitalized, late fees forgiven and affordable payments." Pl. Memo. at 30 (citing to Am. Compl. Ex. 11, Mr. Mahan's TPP Agreement). The complaint alleges not only that Litton failed to live up to its contractual obligations under the TPP Agreements, but also that Litton "knowingly fail[ed] to provide adequate training and staffing to perform its duties" and "fail[ed]to supervise its agents and employees properly including . . . its loss mitigation and collection personnel and its foreclosure attorneys." Am. Compl. at ¶ 154. This is a sufficient assertion of bad faith and is sufficient to state a claim under the breach of the implied covenant of good faith and fair dealing.[6] Accordingly, this claim survives Litton's motion to dismiss.

### D. Promissory Estoppel

Plaintiffs' promissory estoppel is explicitly asserted as an alternative theory of recovery for a contract that is not supported by consideration. Because Plaintiffs have stated a plausible claim for breach of a contract supported by consideration, as discussed above, the Court need not consider the alternative estoppel theory at this juncture. Accord Bosque, 762 F.Supp.2d at 353; Durmic, 2010 WL 4825632, at *5. Accordingly, the Court refuses to dismiss this claim at this stage of the case.

### E. Massachusetts Consumer Protection Act, Mass. G. L. c. 93A

---

[6]Litton also argues that Plaintiffs' implied covenant claim must fail because the TPP Agreements do not constitute binding contracts and the Plaintiffs have not alleged damages. The Court rejects these arguments for the same reasons it rejected Litton's identical objections to Plaintiffs' breach of contract claim as discussed above.

Section 9 of Chapter 93A provides a private cause of action for "any person . . . who has been injured by another person's use or employment of" an unfair or deceptive act or practice. Mass. G. L. c. 93A, § 9 (2004). "A practice is unfair if it is within . . . the penumbra of some common-law, statutory, or other established concept of unfairness; . . . is immoral, unethical, oppressive, or unscrupulous. . . ." Blue Hills Office Park LLC v. J.P. Morgan Chase Bank, 477 F.Supp.2d 366, 376 (D. Mass. 2007) (internal citations and quotations omitted).

Plaintiffs' complaint alleges that Litton violated four regulations promulgated pursuant to Chapter 93A, see Am. Compl. at ¶167 (citing to 940 C.M.R. §§ 3.05, 3.16, 8.06, and 25.03), by making deceptive, false or misleading representations to Plaintiffs regarding their eligibility for a permanent loan modification and their rights under both the TPP Agreements and under the consumer lending standards enshrined in HAMP, as well as by inadequately or misleadingly describing the foreclosure-related services Litton offered to the Plaintiffs. Throughout the amended complaint, Plaintiffs allege that they were led to believe that they would be entitled to a permanent loan modification or a denial of eligibility if they complied with their obligations under the TPP Agreement. "These allegations are plainly sufficient to state a claim under ch. 93A for unfair or deceptive practices." Bosque, 762 F.Supp.2d at 354.[7] Accordingly, Plaintiffs' 93A claim survives the instant motion to dismiss.

## VI. Conclusion

For the reasons discussed above, Defendant Litton's Motion to Dismiss is DENIED.

**So ordered.**

/s/ Denise J. Casper

---

[7]Litton also argues that Plaintiffs have failed to allege damages pursuant to the 93A claim. Again, for the reasons already discussed, the Court concludes that the Plaintiffs have sufficiently alleged damages. See Am. Compl. at ¶¶ 168(a)-(i) (enumerating injuries).

United States District Judge