**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **CAROL BELYEA, BRUCE BELYEA, LUCILLE BOTELHO, WAYNE BOTELHO, and CHARDON MAHAN** on behalf of themselves and all others similarly situated,<br><br>        **Plaintiffs,**<br>**vs.**<br><br>**LITTON LOAN SERVICING, LLP,**<br><br>        **Defendant.** | **C.A. NO.  10-10931-GAO**<br><br>**SECOND AMENDED**<br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>**Leave to file granted**<br>**September 27, 2011**<br>**Scheduling Order [Dkt. # 48]** |

## INTRODUCTION

1.      Carol Belyea, Bruce Belyea, Lucille Botelho, Wayne Botelho, and Chardon Mahan bring this suit on behalf of themselves and a class of similarly situated Massachusetts residents ("Plaintiffs") to challenge the failure of Defendant Litton Loan Servicing, LLP ("Defendant" or "Litton") to honor its agreements with borrowers to modify mortgages and prevent foreclosures under the United States Treasury's Home Affordable Modification Program ("HAMP").

2.      Plaintiffs' claims are simple – when a large financial institution promises to modify an eligible loan to prevent foreclosure, homeowners who live up to their end of the bargain expect that promise to be kept. This is especially true when the financial institution is acting under the aegis of a federal program that is specifically targeted at preventing foreclosure.

3.      As a participating servicer in HAMP, Litton has entered into a written agreement with Plaintiffs, in which it agreed to provide Plaintiffs with a permanent loan modification if Plaintiffs made three monthly trial period payments and complied with its requests for accurate documentation. Plaintiffs, for their part, have complied with this agreement by submitting the required documentation and making payments. Despite Plaintiffs' efforts, Defendant Litton failed to meet its contractual obligation to permanently modify their loans.

4.      The same problems affect other members of the putative class. As a result, Plaintiffs and hundreds, if not thousands, of other Massachusetts homeowners are wrongfully being deprived of an opportunity to cure their delinquencies, pay their mortgage loans and save their homes. Defendant's actions thwart the purpose of HAMP and are illegal under Massachusetts law.

## JURISDICTION

5.      Plaintiffs invoke the jurisdiction of this Court pursuant to 28 U.S.C. § 1332 because the action is between parties that are citizens of different states and the amount in controversy is greater than $75,000. For diversity jurisdiction purposes, a national bank is a citizen of the state designated as its main office on its organization certificate. *Wachovia Bank, N.A. v. Schmidt*, 546 U.S. 303, 306 (2006). Litton is, on information and belief, a citizen of Texas. Plaintiffs are citizens of Massachusetts.

6.      This court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) in that it is brought as a putative class action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and at least one member of the class of plaintiffs is a citizen of a State different from any defendant.

7.      Venue is proper in this Court pursuant to 28 U.S.C. 1391(b) inasmuch as the unlawful practices are alleged to have been committed in this District, Defendant regularly

conducts business in this District, and the named Plaintiffs reside in this District.

## PARTIES

8.      Carol and Bruce Belyea are a married couple residing at 78 Hewlett Street,

Roslindale, Massachusetts 02131.

9.      Lucille and Wayne Botelho are a married couple residing at 5 Gardiner Street,

Fairhaven, Massachusetts 02719.

10.     Chardon Mahan resides with his wife and disabled son at 85 Island Street,

Marshfield, Massachusetts 02020.

11.     Litton, a Delaware corporation, is a mortgage loan servicing company with its

headquarters at 4828 Loop Central Drive, Suite 600, Houston, Texas 77056.

## FACTUAL BACKGROUND

### *The Foreclosure Crisis*

12.     Beginning in 2008, the United States was plunged into a foreclosure crisis. A

congressional oversight panel noted in 2009 that one in eight U.S. mortgages was in foreclosure

or default.[1]

13.     The number of Massachusetts properties with foreclosure filings in 2008 was

150% higher than in 2007 and 577% higher than in 2006 – a near seven-fold increase in only two

years.[2]

14.     In 2009, the numbers continued to rise; in the third quarter of 2009, foreclosures

were filed on 12,667 Massachusetts properties, a 35% increase over the same period of 2008.[3]

Overall in 2009, over 36,000 individual properties in Massachusetts had foreclosure filings

---

[1] Congressional Oversight Panel, Oct. 9, 2009 report at 3.  Available at http://cop.senate.gov/reports/library/report-100909-cop.cfm.
[2] RealtyTrac Staff. Foreclosure Activity Increases 81 Percent in 2008. Jan. 15, 2009. Available at http://www.realtytrac.com/contentmanagement/pressrelease.aspx?channelid=9&accnt=0&itemid=5681.
[3] RealtyTrac Staff. U.S. Foreclosure Activity Increases 5 Percent in Q3. Oct. 15, 2009. Available at http://www.realtytrac.com/contentmanagement/pressrelease.aspx?channelid=9&accnt=0&itemid=7706.

against them which, while slightly less than 2008, still represented an increase of over 100%

from 2007 levels and an increase of more than 400% over 2004.[4]

16.    Increased foreclosures have a detrimental effect not just on the borrowers who

lose unique property and face homelessness, but also on the surrounding neighborhoods that

suffer decreased property values and municipalities that lose tax revenue.

### Creation of the Home Affordable Modification Program

16.    Congress passed the Emergency Economic Stabilization Act of 2008 on October

3, 2008 and amended it with the American Recovery and Reinvestment Act of 2009 on February

17, 2009 (together, the "Act"). 12 U.S.C.A. § 5201 *et seq.* (2009).

17.    The purpose of the Act is to grant the Secretary of the Treasury the authority to

restore liquidity and stability to the financial system, and ensure that such authority is used in a

manner that "protects home values" and "preserves homeownership." 12 U.S.C.A. § 5201.

18.    The Act grants the Secretary of the Treasury the authority to establish the

Troubled Asset Relief Program, or TARP. 12 U.S.C. § 5211. Under TARP, the Secretary may

purchase or make commitments to purchase troubled assets from financial institutions. *Id.*

19.    Congress allocated up to $700 billion to the United States Department of the

Treasury for TARP. 12 U.S.C. § 5225.

20.    In exercising its authority to administer TARP, the Act mandates that the

Secretary "shall" take into consideration the "need to help families keep their homes and to

stabilize communities." 12 U.S.C. § 5213(3).

21.    The Act further mandates, with regard to any assets acquired by the Secretary that

are backed by residential real estate, that the Secretary "shall implement a plan that seeks to

---

[4] RealtyTrac Staff.  RealtyTrac Year End Report Shows Record 2.8 Million U.S. Properties with Foreclosure Filings
in 2009.  Available at http://www.realtytrac.com/contentmanagement/pressrelease.aspx?channelid=9&itemid=8333

maximize assistance for homeowners" and use the Secretary's authority over servicers to encourage them to take advantage of programs to "minimize foreclosures."  12 U.S.C.A. § 5219.

22.     The Act grants authority to the Secretary of the Treasury to use credit enhancement and loan guarantees to "facilitate loan modifications to prevent avoidable foreclosures." *Id.*

23.     The Act imposes parallel mandates to implement plans to maximize assistance to homeowners and to minimize foreclosures. 12 U.S.C.A. § 5220.

24.     On February 18, 2009, pursuant to their authority under the Act, the Treasury Secretary and the Director of the Federal Housing Finance Agency announced the Making Home Affordable Program.

25.     The Making Home Affordable Program consists of two subprograms. The first sub-program relates to the creation of refinancing products for individuals with minimal or negative equity in their home, and is now known as the Home Affordable Refinance Program, or HARP.

26.     The second sub-program relates to the creation and implementation of a uniform loan modification protocol, and is now know as the Home Affordable Modification Program, or HAMP. It is this subprogram that is at issue in this case.

27.     HAMP is funded by the federal government, primarily with TARP funds. The Treasury Department has allocated at least $75 billion to HAMP, of which at least $50 billion is TARP money.

28.     Under HAMP, the federal government incentivizes participating servicers to enter into agreements with struggling homeowners that will make adjustments to existing mortgage obligations in order to make the monthly payments more affordable.  Servicers receive $1000.00

for each HAMP modification.

### *Broken Promises Under HAMP*

29.     The industry entities that perform the actual interface with borrowers – including

such tasks as payment processing, escrow maintenance, loss mitigation and foreclosure – are

known as "servicers."  Servicers typically act as the agents of the entities that hold mortgage

loans. Defendant Litton is a servicer and its actions described herein were made as agents for the

entities that hold mortgage loans.

30.     Should a servicer elect to participate in HAMP,[5] they execute a Servicer

Participation Agreement ("SPA") with the federal government.

31.     On August 6, 2009, Larry B. Litton, Jr., President and Chief Executive Officer of

Litton executed an SPA, thereby making Litton a participating servicer in HAMP.  This

document is attached and incorporated as Exhibit 1.

32.     The SPA executed by Mr. Litton incorporates all "guidelines," "procedures," and

"supplemental documentation, instructions, bulletins, letters, directives, or other

communications" issued by the Treasury, Fannie Mae or Freddie Mac in connection with the

duties of Participating Servicers. These documents together are known as the "Program

Documentation" (SPA at ¶ 1.A.), and are incorporated by reference herein.

33.     The SPA mandates that a Participating Servicer "shall perform" the activities

described in the Program Documentation "for all mortgage loans it services."  (SPA at ¶¶ 1.A.,

2.A.)[6]

---

[5] Certain classes of loans, namely those held by Federal National Mortgage Association ("Fannie Mae"), Federal
Home Loan Mortgage Corporation ("Freddie Mac") or companies that accepted money under TARP, are subject to
mandatory inclusion in HAMP.  Otherwise, participation by servicers in HAMP is voluntary.
[6] The Program Documentation also includes Supplemental Directive 09-01 ("SD 09-01," attached hereto as Exhibit
2), Home Affordable Modification Program; Base Net Present Value (NPV) Model Specifications ("NPV
Overview," attached hereto as Exhibit 3) and Supplemental Documentation—Frequently Asked Questions
("HAMPFAQS," attached hereto as Exhibit 4), Supplemental Directive 09-08 ("SD 09-08," attached hereto as

34.     The Program Documentation requires Participating Servicers to evaluate *all loans*
that are 60 or more days delinquent for HAMP modifications. (SD 09-01 at 4.)  In addition, if a
borrower contacts a Participating Servicer regarding a HAMP modification, the Participating
Servicer must collect income and hardship information to determine if HAMP is appropriate for
the borrower.

35.     A HAMP modification consists of two stages. First, a Participating Servicer is
required to gather information and, if appropriate, offer the homeowner a Trial Period Plan
("TPP").[7]  The TPP consists of a three-month period in which the homeowner makes mortgage
payments in an amount determined using HAMP rules known as "the waterfall," based on the
initial financial information provided.

36.      Before it offers a borrower a TPP, the servicer must determine that the loan meets
certain criteria (including that the investor who owns it is participating in HAMP) and also
evaluate all aspects of the homeowner's eligibility for a permanent Home Affordable
Modification, subject to verification of the information used to make the evaluation.  *See* SD 09-
01 at 4-5; SD 10-02 at 9-10.   This includes determining what the terms of the modification will
be under the HAMP "waterfall" and checking to make sure the modification passes the "Net
Present Value" test.  SD 09-01 at 4-5, 17-18.

37.     The TPP consists of a three-month period in which the homeowner makes
mortgage payments in an amount determined using the HAMP "waterfall," based on the initial

---

Exhibit 5) and Supplemental Directive 10-02 ("SD 10-02," attached hereto as Exhibit 13).  More recently,
Treasury's Supplemental Directives have been compiled into a periodically updated "Handbook."  The most recent
version of the Handbook is attached hereto as Exhibit 14.  These documents together describe the basic activities
required under HAMP and are incorporated by reference in both of the TPP Agreements signed by Plaintiffs as well
as herein.

[7] The eligibility criteria for HAMP, as well as the formula used to calculate monthly mortgage payments under the
modification, are explained in detail in SD 09-01, attached hereto as Exhibit 2.  Generally speaking, the goal of a
HAMP modification is for owner-occupants to receive a modification of a first-lien loan by which the monthly
mortgage payment is reduced to 31% of their monthly income for the next five years.

financial information provided.

38.     Litton offers TPPs to eligible homeowners by way of a TPP Agreement, which describes the homeowner's duties and obligations under the plan and promises a permanent HAMP modification for those homeowners that execute the agreement and fulfill the documentation and payment requirements.

39.     If the homeowner executes the TPP Agreement, complies with all documentation requirements and makes all three TPP monthly payments, the second stage of the HAMP process is triggered, in which the homeowner is offered a permanent modification.

40.     Litton has routinely failed to live up to their end of the TPP Agreement and offer permanent modifications to homeowners.   In August 2010, the U.S. Treasury reported that Litton had 47,451 HAMP-eligible loans in its portfolio.  Of these loans, just 8,447 resulted in permanent modifications (approximately 17%) even though many more homeowners had made the payments and submitted the documentation required by the TPP Agreement. The Treasury Report is attached hereto as Exhibit 6.  That same report indicates that Litton is among the worst servicers in the nation in terms of the conversion rate of trial period plans into permanent modifications.

41.     By failing to live up to the TPP Agreement and convert trial period plans into permanent modifications, Litton is leaving homeowners in a state of limbo and stressful anxiety, wondering if their home can be saved. Litton is also preventing homeowners from pursuing other avenues of resolution, including using the money they are putting toward TPP payments to fund bankruptcy plans, relocation costs, short sales or other means of curing their default.  Litton's conduct in promising a permanent modification following compliance with a TPP Agreement was the direct cause of Plaintiffs' decisions not to pursue other avenues of resolving their default.

*Carol and Bruce Belyea*

42.     Carol and Bruce Belyea (together, "the Belyeas") have owned their home at 78 Hewlett Street in Roslindale, Massachusetts since 2001. Carol currently works as a part-time checkout clerk at two retail stores. Bruce works as a part-time night stockperson for a grocery store and also works as a part-time stockperson at another retail store.

43.     In 2007, the Belyeas refinanced their home with a $376,000 mortgage loan ("mortgage loan") from Senderra Funding LLC.

44.     The servicing of the mortgage loan was transferred to defendant Litton sometime around October 2008 and continues to be serviced by Defendant to this date.

45.     The Belyeas have continuously faced financial hardship, causing them to have difficulty making payments on their mortgage loan.  Nevertheless, the Belyeas never missed a payment on their mortgage prior to their application for HAMP, and have not missed a payment since that time either, with the exception of payments tendered but rejected by Litton following the commencement of this litigation.

46.     In August 2009, the Belyeas applied to Litton for a *Making Home Affordable* loan modification and sent in documentation.

47.     By letter dated August 21, 2009, Litton offered the Belyeas a TPP Agreement entitled *Home Affordable Modification Trial Period Plan* ("Trial Period Plan" or "TPP").

48.     The Belyeas timely accepted the offer by executing the TPP Agreement and returning it to Litton, along with the completed Hardship Affidavit, IRS Form 4506-T, other supporting documentation, and the first TPP payment of $1,304.99 (due on October 1, 2009) on September 13, 2009.  A copy of the TPP agreement sent by the Belyeas to Litton in September is attached hereto as Exhibit 7.

49.     The TPP Agreement provided that the plan was effective October 1, 2009 and would run from October 2009 to December 2009. The monthly mortgage payments were $1,304.99 under the TPP.

50.     The first sentence of Litton's standard form TPP Agreement executed by the Belyeas and all other class members provides: "If I am in compliance with this [TPP] and my representations in Section 1 continue to be true in all material respects, then the Lender will provide me with a Home Affordable Modification Agreement ('Modification Agreement'), as set forth in Section 3, that would amend and supplement 1) the Mortgage on the Property and (2) the Note secured by the Mortgage."

51.     Section 2 of the TPP Agreement provides that "TIME IS OF THE ESSENCE under this Plan" and defines the "Modification Effective Date" for the permanent HAMP modification as "the first day of the month following the month in which the last Trial Period Payment is due."

52.      Section 3 of the TPP Agreement references the means by which the principal balance and monthly payment amounts of the permanent modification will be calculated.

53.     The Belyeas timely made each of the payments contemplated in the TPP Agreement due in October, November, and December 2009 (on September 13, October 5, and November 6, 2009, respectively).

54.     Nonetheless, by letter dated December 3, 2009, Litton informed the Belyeas that they would not be receiving a permanent modification.  Litton stated that its decision was made because it had not received "the additional required information."  To the best of their knowledge, the Belyeas provided all documentation requested of them.

55.     On or about December 22, 2009, an employee of Litton told Carol Belyea that she

must make a $1,226.24 payment to make up the difference between their October TPP payment and their regular mortgage payment for that month.  Fearing that their home was in jeopardy of foreclosure, Carol made this payment to Litton over the telephone.

56.     Subsequently, the Belyeas received a bill from Litton for approximately $10,000.

57.     On or about January 18, 2010, a Litton employee told Carol Belyea on the telephone that the Belyeas must send $7,660.93, purportedly the difference between the TPP payments and the full payments due for those months, the scheduled January payment and accrued late charges and other fees, by April 20 or Litton would begin foreclosure proceedings.

58.     On January 18, 2010, the Belyeas withdrew approximately $12,000 from Bruce's retirement account to pay the $7,660.93 to Litton and to put aside $3,600 in order to cover the early withdrawal tax penalty.

59.     On February 14, 2010, the Belyeas made their full monthly mortgage payment of $2,592.46.

60.     Subsequently, Litton tendered the Belyeas a second TPP Agreement.

61.     The Belyeas timely accepted the offer by executing the second TPP Agreement and returning it to Litton, along with the requested documentation, including their tenant's lease agreement, a cancelled check, and the first payment of $1,436.98 on March 5, 2010.  A copy of the signed TPP Agreement submitted by the Belyeas to Litton in March is attached hereto as Exhibit 8.

62.     The March TPP Agreement provides that the plan was effective April 1, 2010 and would run from April 2010 to June 2010. The monthly mortgage payments were $1,436.98 under the new TPP Agreement.

63.     Like the September TPP Agreement, the March TPP Agreement provides: "If I

am in compliance with this [TPP] and my representations in Section 1 continue to be true in all

material respects, then the Lender will provide me with a Home Affordable Modification

Agreement ('Modification Agreement'), as set forth in Section 3, that would amend and

supplement 1) the Mortgage on the Property and (2) the Note secured by the Mortgage."

64.     The Belyeas timely made each of the payments contemplated in the first TPP

Agreement due in October, November and December 2009.   They also took extraordinary

measure to cure purported defaults when Litton broke its promise of tendering them a permanent

loan modification at the close of the first TPP.

65.     As of this date, the Belyeas are in compliance with both their TPP Agreements

and their representations to the Defendant continue to be true in all material respects.  Indeed,

since the HAMP process began, the Belyeas have made each monthly payment – either full

payment or trial payments – as directed by Litton.

66.     In January 2011, approximately seventeen months after they first applied for

HAMP, Litton tendered to the Belyeas a HAMP-compliant permanent modification, which they

accepted.

67.     The Belyeas nevertheless continue to experience the negative impacts associated

with Litton's failure to adhere to its contractual obligations, including but not limited to adverse

tax consequences and improper impairments to credit.

*Lucille and Wayne Botelho*

68.     Lucille and Wayne Botelho (the "Botelhos") have owned their home at 5 Gardner

Street in Fairhaven, MA since 1998.  The Botelhos are both employed by a telecommunications

company.

69.     On September 18, 2006, the Botelhos took out a mortgage loan to refinance their

home from Fremont Investment and Loan.

70.     At some point after the Botelhos took out their loan, the servicing of the loan was transferred to Litton.  Litton continues to service the loan to this date.

71.     In 2008, the Botelhos began experiencing various financial hardships that combined to cause them to have difficulty making their mortgage payments.  By letter dated June 16, 2008, Litton notified the Botelhos that their mortgage was in default.

72.     In June 2009, the Botelhos applied to Litton for a HAMP loan modification and sent in documentation.

73.     In July 2009, Litton offered the Botelhos a TPP Agreement entitled *Home Affordable Modification Trial Period Plan* ("Trial Period Plan" or "TPP").

74.     On or about July 28, 2009, the Botelhos timely accepted the offer by executing the TPP Agreement and returning it to Litton, along with the completed Hardship Affidavit, IRS Form 4506-T, other supporting documentation, and the first TPP payment of $2,971.97.  A copy of the signed TPP Agreement sent by the Botelhos to Litton is attached hereto as Exhibit 10.

75.     The TPP Agreement provided that the plan was effective August 1, 2009 and would run from August 2009 to October 2009. The monthly mortgage payments were $2,971.97 under the TPP Agreement.

76.     The first sentence of the TPP Agreement provides: "If I am in compliance with this [TPP] and my representations in Section 1 continue to be true in all material respects, then the Lender will provide me with a Home Affordable Modification Agreement ('Modification Agreement'), as set forth in Section 3, that would amend and supplement 1) the Mortgage on the Property and (2) the Note secured by the Mortgage."

77.     Section 2 of the TPP Agreement provides that "TIME IS OF THE ESSENCE

13

under this Plan" and defines the "Modification Effective Date" for the permanent HAMP

modification as "the first day of the month following the month in which the last Trial Period

Payment is due."

78.     Section 3 of the TPP Agreement references the means by which the principal

balance and monthly payment amounts of the permanent modification will be calculated.

79.     Despite having made their first payment under the TPP Agreement, the Botelhos

received a Notice of Default and Intent to Accelerate from Litton on or about August 25, 2009.

80.     The Botelhos timely made each of the payments contemplated in the first TPP

Agreement and complied with all documentation requests.

81.     Nevertheless, on or about October 28, 2009, the Botelhos received a letter from

Litton indicating that they would not be offered a permanent loan modification because they had

too much income.  The Botelhos believe that this decision was based on a mistaken accounting

of their income.

82.     When the Botelhos called Litton to request that it correct this mistake, they were

told that their ongoing payments would need to make up the difference between their monthly

payments under the TPP Agreement and their previous monthly payment amount – the total new

monthly payment demanded was approximately $3,888 – or else their home would be put into

foreclosure.

83.     In January 2010, Litton sent a second TPP Agreement to the Botelhos,

contemplating a plan effective February 1, 2010 and running from February 2010 to April 2010.

The monthly mortgage payments were $3,246.50 under the new TPP Agreement.

84.     The Botelhos did not understand the reason that the monthly payment amount had

significantly gone up in the second TPP Agreement.  Their efforts to understand this via

telephone calls to Litton were frustrating and did not yield an answer.  Based on Litton's previous failure to live up to its promise in the first TPP Agreement, the Botelhos decided not to execute the second TPP Agreement.

85.     Desiring to cure the arrearage, and worried about the threat of foreclosure, the Botelhos made a payment of approximately $3,888 in March 2010 and April 2010.  The April 2010 payment was rejected by Litton.  Litton has since sent the Botelhos yet another application for HAMP.

86.     The Botelhos complied with their first TPP Agreement and their representations to the Defendant continue to be true in all material respects.

87.     Despite having timely provided Litton with all documentation it requested, Litton did not provide the Botelhos with a permanent loan modification by the end of their first Trial Period.

88.     Despite the Botelhos continuing efforts, they have still not been offered a permanent loan modification under HAMP guidelines.

89.     Defendant has therefore breached the provision of the TPP Agreement that compliance with the TPP Agreement for the three-month trial period would result in a permanent loan modification.  At this point, the Botelhos first TPP is now twenty-six months old.

90.     Had Litton not found the Botelhos eligible for HAMP and offered them a TPP Agreement, the Botelhos would have pursued other avenues of addressing their difficulty in paying their mortgage.

91.     Like the other borrowers in this matter, the Botelhos have been living in a state of limbo and stressful anxiety, without any assurances that their home will not be foreclosed, despite their compliance with the TPP Agreement.

*Chardon Mahan*

92.     Chardon Mahan ("Mr. Mahan") has owned his home at 85 Island Street, Marshfield, Massachusetts for over 10 years.

93.     On or about November 14, 2006, Mr. Mahan refinanced his home with a $348,000 mortgage loan from New Century Mortgage Corporation.

94.     The servicing of the mortgage loan was transferred to defendant Litton sometime around July 2008 and continues to be serviced by Defendant to this date.

95.     In or about August 2009, Mr. Mahan began experiencing various financial hardships.  This caused Mr. Mahan to have difficulty making payments on his mortgage loan, although he continued to make timely monthly payments.  Indeed, Mr. Mahan never missed a payment on his mortgage prior to his application for HAMP, and has made all of his mortgage payments to date.

96.     In or about August 2009, Litton sent Mr. Mahan an unsolicited application for HAMP.  Mr. Mahan responded to this offer by providing financial information, as well as returning the completed application and other materials.  Mr. Mahan sent these materials back to Litton on or about September 2, 2009.

97.     In response, Litton sent Mr. Mahan a TPP Agreement in early October 2009.

98.     On October 16, 2009, Mr. Mahan timely accepted, executed and returned the TPP Agreement, along with a completed Hardship Affidavit, IRS Form 4506-T, other supporting documentation, and the first trial period payment of $1,940.50.

99.     The TPP Agreement provided that the plan was effective December 1, 2009 and would run from December 2009 to February 2010.  The monthly mortgage payments were $1,940.50 under the TPP Agreement.

100.     The first sentence of the TPP Agreement provides: "If I am in compliance with this [TPP] and my representations in Section 1 continue to be true in all material respects, then the Lender will provide me with a Home Affordable Modification Agreement ("Modification Agreement'), as set forth in Section 3, that would amend and supplement (1) the Mortgage on the Property and (2) the Note secured by the Mortgage."

101.     Section 2 of the TPP Agreement provides that "TIME IS OF THE ESSENCE under this Plan" and defines the "Modification Effective Date" for the permanent HAMP modification as "the first day of the month following the month in which the last Trial Period Payment is due."

102.      Section 3 of the TPP Agreement references the means by which the principal balance and monthly payment amounts of the permanent modification will be calculated.

103.     Despite the fact that Mr. Mahan had already accepted Litton's offer and made the first payment under his TPP Agreement, Litton sent Mr. Mahan a second, identical TPP Agreement on October 22, 2009.  This TPP Agreement also provided that the plan was effective December 1, 2009 and the monthly mortgage payments were $1,940.58.  A copy of this TPP Agreement between Mr. Mahan and Litton is attached hereto as Exhibit 11.

104.     On November 4, 2009, pursuant to the second TPP Agreement, Mr. Mahan again sent his financial and supporting documentation, the fully executed TPP Agreement, the original Hardship Affidavit, and the first TPP payment of $1,940.50 in a timely manner.

105.     Mr. Mahan timely made each of the payments contemplated in both of the TPP Agreements due in December 2009, January, and February 2010.  Mr. Mahan also continued to make TPP payments in March, April, and May 2010.

106.     Since the TPP period began, and at all times relevant hereto, Mr. Mahan has

responded to all document requests made by Litton by timely supplying the requested documents.  He has also affirmed all the certifications asked of him by Litton.

107.    Litton inflicted on Mr. Mahan redundant and ambiguous and threatening demands for documents while all along continuing to accept his TPP payments.

108.    In February 2010, counsel for Mr. Mahan contacted Litton to question the redundant document requests, and spoke with a Litton employee named Toya Garrett ("Garrett." Through Garrett, Litton again requested the same documentation Mr. Mahan had previously submitted, which he subsequently provided for the fourth time.

109.    Mr. Mahan followed up with Garrett and Litton on multiple occasions over the following months and confirmed that his permanent modification was still being processed.

110.    In subsequent conversations with Garrett, Mr. Mahan's counsel was told that Mr. Mahan's modification "looked good" and "should be approved soon."

111.    In May 2010, Mr. Mahan's counsel left several messages for Garrett and sent a letter to Litton requesting a response concerning Mr. Mahan's modification.

112.    Despite his compliance in all material respects with the terms of the TPP Agreement, Litton failed to provide Mr. Mahan a permanent loan modification by the end of his Trial Period.

113.    By letter dated May 24, 2010, Litton informed Mr. Mahan that he would not be receiving a permanent modification.  Litton stated that Mr. Mahan did not qualify for a permanent loan modification based on the results of the net present value (NPV) test.

114.    On May 27, 2010, only three (3) days after denying Mr. Mahan a permanent loan modification, Litton sent Mr. Mahan a Notice of Default and Intent to Accelerate, informing Mr. Mahan that he was delinquent in the amount of $6,143.51 and threatening acceleration of his

loan – despite the fact that Mr. Mahan had never missed a single monthly mortgage payment to Litton.  Litton continued to send these threatening collection actions in June and July 2010, despite the fact that Mr. Mahan timely made all prior mortgage payments and all TPP payments.

115.    Worried about the threat of foreclosure and as requested by Litton, Mr. Mahan struggled to resume monthly payments at his pre-Trial Period levels in June, July, and August 2010.  The arrears that had accrued during the Trial Period, however, remained.

116.    Defendant has breached the TPP Agreement it entered into with Mr. Mahan insofar as it promised that compliance with the TPP Agreement would result in a permanent loan modification.

117.    On August 3, 2010, Mr. Mahan's counsel sent Litton a G.L. c. 93A demand letter described below and attached as Exhibit 12.  Litton responded by letter dated September 7, 2010, refusing to offer Mr. Mahan a permanent loan modification.

118.    On September 30, 2010, Mr. Mahan received two additional ambiguous letters from Litton in the same package.  The first letter, dated September 23, 2010, indicated that Litton was rejecting Mr. Mahan's application for a HAMP modification on the erroneous basis that he had not provided requested documents.  The second letter, dated September 24, 2010, puzzlingly solicits a new application for HAMP from Mr. Mahan, despite the contradictory letters previously sent by Litton.

119.    On August 31, 2011, approximately two years after he first applied for HAMP, Litton tendered Mr. Mahan a HAMP-compliant permanent modification, which he accepted.

120.    Nevertheless, Mr. Mahan continues to experience the negative impacts associated with Litton's failure to adhere to its contractual obligations, including but not limited to adverse tax consequences and improper impairments to credit.

### *Class Allegations*

121.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

122.    Plaintiffs bring this class action on behalf of themselves and a class of similarly situated individuals defined as follows:

All Massachusetts homeowners whose home mortgage loans have been serviced by Litton and who, since August 6, 2009, have entered into a TPP Agreement with Litton and made the trial payments expressly identified by their TPP Agreement, other than borrowers to whom Litton timely tendered either:

a. A Home Affordable Modification Agreement that complied with HAMP rules; or

b. A written denial of eligibility consistent with the terms of the TPP Agreement.

Excluded from the this class are governmental entities, Defendants, their affiliates and subsidiaries, Litton's current employees and current or former officers, directors, agents, representatives, their family members, the members of this Court and its staff.

123.    Plaintiffs sue on their own behalf and on behalf of a class of persons under Rules 23(a) and (b) of the Federal Rules of Civil Procedure.

124.    Plaintiffs do not know the exact size or identities of the members of the proposed class, since such information is in the exclusive control of Defendant. Plaintiffs believe that the class encompasses many hundreds of individuals whose identities can be readily ascertained from Defendant's books and records. Therefore, the proposed class is so numerous that joinder of all members is impracticable.

125.    Based on the size of the modifications at issue, Plaintiffs believe the amount in controversy exceeds $5 million.

126.    All members of the class have been subject to and affected by the same conduct.

The claims are based on form contracts and uniform loan modification processing requirements. There are questions of law and fact that are common to the class, and predominate over any questions affecting only individual members of the class. These questions include, but are not limited to the following:

a.  the nature, scope and operation of Defendant's obligations to homeowners under HAMP;

b.  whether Defendant's receipt of an executed TPP Agreement, along with supporting documentation and three monthly payments, creates a binding contract or otherwise legally obligates Defendant to offer class members a permanent HAMP modification;

c.  whether Defendant's failure to provide permanent HAMP modifications in these circumstances amounts to a breach of contract and/or a breach of the covenant of good faith and fair dealing; and

d.  whether the Court can order Defendant to pay damages and what the proper measure of damages is, and also whether the Court can enter injunctive relief.

127.    The claims of the individual named Plaintiffs are typical of the claims of the class and do not conflict with the interests of any other members of the class in that both the Plaintiffs and the other members of the class were subject to the same conduct, signed the same agreement and were met with the same absence of a permanent modification.

128.    The individual named Plaintiffs will fairly and adequately represent the interests of the class. They are committed to the vigorous prosecution of the class' claims and have retained attorneys who are qualified to pursue this litigation and have experience in class actions – in particular, consumer protection actions.

129.    A class action is superior to other methods for the fast and efficient adjudication

of this controversy. A class action regarding the issues in this case does not create any problems of manageability.

130.    This putative class action meets both the requirements of Fed. R. Civ. P. 23(b)(2) and Fed. R. Civ. P. 23(b)(3).

131.    The Defendant has acted or refused to act on grounds that apply generally to the class so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

COUNT I

***Breach of Contract***

132.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

133.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class described above.

134.    As described above, the TPP Agreement sent by Defendant to Plaintiffs constitutes a valid offer.

135.    By executing the TPP Agreements and returning it to Defendant along with the supporting documentation, Plaintiffs accepted Defendant's offers.

136.    Alternatively, Plaintiffs' return of the TPP Agreements constituted offers. Acceptances of these offers occurred when Defendant accepted Plaintiffs' TPP payments.

137.    Plaintiffs' TPP payments to Defendant constitute consideration because those payments were of a different character and amount from the payments they were otherwise legally obligated to make.  Also, by making those payments, Plaintiffs gave up the ability to pursue other means of saving their home, and Defendant received payments it might otherwise not have.  In addition, Plaintiffs provided consideration because Litton received important benefits from entering into the TPP Agreement, as illustrated by the initial positive outcome of

the NPV test.

138.    Other elements of Plaintiffs' participation in HAMP also constitute consideration for the TPP Agreement, including the provision of detailed financial information, the setting up of escrow accounts, and compliance with credit counseling requirements.

139.    Plaintiffs and Defendant thereby formed valid contracts.

140.    To the extent that the contract was subject to a condition subsequent providing Litton an opportunity to review the documentation submitted by Plaintiffs when they returned the signed TPP Agreements, this condition was waived by Litton and/or it is estopped to assert it as a defense to Plaintiffs' claims.

141.    By failing to offer Plaintiffs permanent HAMP modifications, Defendant breached those contracts.

142.    Plaintiffs remain ready, willing and able to perform under the contracts by continuing to make TPP payments and provide documentation.

143.    Plaintiffs have suffered harm and are threatened with additional harm from Defendant's breach. By making TPP payments both during and after the TPP, Plaintiffs forewent other remedies that might be pursued to save their homes, such as restructuring their debt under the bankruptcy code, or pursuing other strategies to deal with their defaults, such as selling their homes.  In addition to the lost opportunity cost of pursuing other means of dealing with their default, when a permanent modification is not offered at the close of the three-month Trial Period, the borrower's permanent modification terms may be adversely affected and additional fees and charges may be applied.  On information and belief, Defendant has imposed improper fees and costs on borrowers during and after their Trial Period.  Some members of the putative class also suffered additional harm in the form of foreclosure/ collection activity against their

homes.  Plaintiffs have suffered the additional harm of having improper adverse reporting against

their credit profiles.  In addition, Plaintiffs may have also suffered adverse tax consequences.

Plaintiffs have also incurred damages because the Defendant's breach, i.e., Litton's failure to

provide permanent HAMP modifications, means that Plaintiffs are now further in arrears than

they would have otherwise been.  These damages are especially acute for borrowers, such as the

Belyeas and Mr. Mahan, who were not even in default at the time they entered their TPP

Agreements.  Last, members of the putative class have been living in a state of stressful anxiety

because of the limbo in which the Defendant has placed them.

COUNT II

***Breach of the Implied Covenant of Good Faith and Fair Dealing***

144.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

145.    Plaintiffs bring this claim on their own behalf and on behalf of each member of

the Class described above.

146.    Defendant is obligated by contract and common law to act in good faith and to

deal fairly with each borrower.

147.    "[T]he purpose of the covenant is to guarantee that the parties remain faithful to

the intended and agreed expectations of the parties in their performance." *Uno Restaurants, Inc.

v. Boston Kenmore Realty Corp.*, 441 Mass. 376, 385 (2004).

148.    Defendant routinely and regularly exhibits bad faith and breaches this duty by:

a.   failing to perform loan servicing functions consistent with its responsibilities to

     Plaintiffs;

b.   failing to supervise its agents and employees properly including, without limitation,

     its loss mitigation and collection personnel and its foreclosure attorneys;

c.   routinely demanding information it has already received;

24

    d.   making inaccurate calculations and determinations of Plaintiffs' eligibility for

        HAMP;

    e.   failing to follow through on written and implied promises;

    f.   failing to follow through on contractual obligations;

    g.   knowingly failing to provide adequate training and staffing to perform its duties under

        HAMP; and

    h.   failing to give permanent HAMP modifications and other foreclosure alternatives to

        qualified borrowers.

149.    These actions constitute bad faith by the Defendant.

150.    On information and belief, the Defendant financially benefits from its breaches in a variety of ways, including but not limited to by not hiring sufficient staff to meet its obligations under HAMP, and the imposition of fees and charges on borrowers' accounts during and after their TPP.

151.    As a result of this bad faith and the absence of fair dealing, Defendant caused Plaintiffs harm.  By making TPP payments both during and after the TPP, Plaintiffs forewent other remedies that might be pursued to save their homes, such as restructuring their debt under the bankruptcy code, or pursuing other strategies to deal with their defaults, such as selling their homes.  In addition to the lost opportunity cost of pursuing other means of dealing with their default, when a permanent modification is not offered at the close of the three-month Trial Period, the borrower's permanent modification terms may be adversely affected and additional fees and charges may be applied.  On information and belief, Defendant has imposed improper fees and costs on borrowers during and after their Trial Period.  Some members of the putative class also suffered additional harm in the form of foreclosure/collection activity against their

homes.  Plaintiffs have suffered the additional harm of having improper adverse reporting against their credit profiles.  In addition, Plaintiffs may have also suffered adverse tax consequences. Plaintiffs have also incurred damages because the Defendant's breach, i.e., Litton's failure to provide permanent HAMP modifications, means that Plaintiffs are now further in arrears than they would have otherwise been.  These damages are especially acute for borrowers, such as the Belyeas and Mr. Mahan, who were not even in default at the time they entered their TPP Agreements.  Last, members of the putative class have been living in a state of stressful anxiety because of the limbo in which the Defendant has placed them.

## COUNT III
### *Promissory Estoppel, in the alternative*

152.     Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

153.     Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class described above.

154.     Defendant, by way of its TPP Agreements, made a representation to Plaintiffs that if they returned the TPP Agreement executed and with supporting documentation, and made their TPP payments, they would receive permanent HAMP modifications.

155.     Defendant's TPP Agreements were intended to induce Plaintiffs to rely on them and make monthly TPP payments.

156.     Plaintiffs did indeed rely on Defendant's representation, by submitting TPP payments.

157.     Given the language in the TPP Agreements, Plaintiffs' reliance was reasonable.

158.     Plaintiffs' reliance was to their detriment. Plaintiffs did not receive timely permanent HAMP modifications.  By making TPP payments both during and after the TPP, Plaintiffs forewent other remedies that might be pursued to save their homes, such as

restructuring their debt under the bankruptcy code, or pursuing other strategies to deal with their defaults, such as selling their homes.  In addition to the lost opportunity cost of pursuing other means of dealing with their default, when a permanent modification is not offered at the close of the three-month Trial Period, the borrower's permanent modification terms may be adversely affected and additional fees and charges may be applied.  On information and belief, Defendant has imposed improper fees and costs on borrowers during and after their Trial Period.  Some members of the putative class also suffered additional harm in the form of foreclosure/collection activity against their homes.  Plaintiffs have suffered the additional harm of having improper adverse reporting against their credit profiles.  In addition, Plaintiffs may have also suffered adverse tax consequences.  Plaintiffs have also incurred damages because the Defendant's breach, i.e., Litton's failure to provide permanent HAMP modifications, means that Plaintiffs are now further in arrears than they would have otherwise been.  These damages are especially acute for borrowers, such as the Belyeas and Mr. Mahan, who were not even in default at the time they entered their TPP Agreements.  Last, members of the putative class have been living in a state of stressful anxiety because of the limbo in which the Defendant has placed them.

## COUNT IV
### *Violation of the Massachusetts Consumer Protection Act and Applicable Regulations*

159.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

160.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class described above.

161.    Defendant has violated and continues to violate the Massachusetts Consumer Protection Act, G.L. c. 93A, § 2 and applicable regulations promulgated by the Massachusetts Attorney General pursuant to G.L. c. 93A, § 2(c) including, without limitation:

a.   940 C.M.R. § 3.16, in that its conduct was unfair, deceptive, oppressive, unconscionable, and contrary to public policy and generally recognized standards applicable to the consumer lending business;

b.   940 C.M.R. § 3.16, in that its conduct violated the requirement of good faith and fair dealing applicable to contracts under G.L. c. 106, §1-203;

c.   940 C.M.R. § 3.16, in that its conduct violated existing statutes, rules, regulations or laws, meant for the protection of the public's health, safety or welfare, as detailed below;

d.   940 C.M.R. § 3.05, in that it made deceptive representations or failed to disclose relevant information as to loan modifications offered to borrowers;

e.   940 C.M.R. § 8.06, in that it is a Mortgage Lender and made false or misleading representations to borrowers; and

f.   940 C.M.R. § 25.03, because it offers Foreclosure-related Services within the meaning of 940 C.M.R. § 25.01 without adequately describing the services offered.

162.   Plaintiffs have been injured by virtue of Defendant's violations.  Said injuries include, but are not limited to:

a.   wrongful foreclosures;

b.   otherwise avoidable losses of homes to foreclosure;

c.   less favorable loan modifications;

d.   increased fees and other costs to avoid or attempt to avoid foreclosure;

e.   loss of savings in fruitless attempts to secure loan modifications;

f.   loss of opportunities to pursue other refinancing or loss mitigation strategies;

g.   improper adverse credit reporting;

h.   adverse tax consequences;

i.   deeper arrearages than would otherwise have been the case; and

j.   significant stress and emotional distress.

163.   Defendant's conduct was and is willful or knowing within the meaning of the

Massachusetts Consumer Protection Act, G.L. c. 93A, § 9.

164.   Defendant's refusal to grant relief upon demand was and is in bad faith, with

knowledge or reason to know that the act or practice complained of violated G.L. c. 93A, § 2.

165.   On June 30, 2010, Mr. and Mrs. Belyea, along with Mr. and Mrs. Botelho, sent

Litton a demand for relief pursuant to G.L. c. 93A on their own behalf and on behalf of a group

of similarly situated individuals.  A copy of this letter is attached as Exhibit 9.  Litton responded

by letter dated July 30, 2010.  Litton extended a settlement offer to the Belyeas, which the parties

are in the process of negotiating.  Litton's response and its counsel's subsequent communications

have not yielded an offer of settlement to the Botelhos or the class of similarly situated

individuals identified in the June 30, 2010 letter in accordance with G.L. c. 93A, § 9(2).  No

offer of settlement was made to the putative class.

166.   In addition, Mr. Mahan sent a demand letter under Chapter 93A on August 3,

2010, attached as Exhibit 12, to which Litton responded without any offer of settlement.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the following relief:

a.   Certify this case as a class action and appoint the named Plaintiffs to be class

representatives and their counsel to be class counsel;

b.   Enter a judgment declaring the acts and practices of Defendant complained of

herein to constitute a breach of contract and a breach of the covenant of good faith and fair

dealing, as well as a declaration that they are required by the doctrine of promissory estoppel to offer permanent modifications to class members;

c.       Grant a permanent or final injunction enjoining Defendant's agents and employees, affiliates and subsidiaries, from continuing to harm named Plaintiffs and the members of the Class;

d.       Order Defendant to adopt and enforce a policy that requires appropriate training of their employees and agents regarding their duties under HAMP;

e.       Order specific performance of Defendant's contractual obligations together with other relief required by contract and law;

f.       Award actual and/or statutory minimum damages pursuant to M.G.L. c. 93A § 9(3) to named Plaintiffs and the Class;

g.       Award multiple damages pursuant to M.G.L. c. 93A § 9(3) to named Plaintiffs and the Class;

h.       Award named Plaintiffs and the Class the costs of this action, including the fees and costs of experts, together with reasonable attorneys' fees pursuant to M.G.L. c. 93A § 9(3);

i.       Grant named Plaintiffs and the Class such other and further relief as this Court finds necessary and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiffs demand a trial by jury on all issues so triable.

Respectfully Submitted,
On behalf of the Plaintiffs

*/s/ Gary Klein*
Gary Klein (BBO 560769)
Shennan Kavanagh (BBO 655174)
Kevin Costello (BBO 669100)

RODDY KLEIN & RYAN
727 Atlantic Avenue, 2nd Floor
Boston, MA  02111-2810
Tel:  (617) 357-5500
Fax:  (617) 357-5030

Stuart Rossman (BBO 430640)
Charles Delbaum (BBO 543225)
NATIONAL CONSUMER LAW CENTER
7 Winthrop Square, 4th floor
Boston, MA 02110
(617) 542-8010 (*telephone)*
(617) 542-8028 *(fax)*

Michael Raabe (BBO 546107)
NEIGHBORHOOD LEGAL SERVICES
170 Common Street, Suite 300
Lawrence, MA 01840
Tel:  (978) 686-6900
Fax:  (978) 685-2933

DATE:  October 14, 2011


## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic File (NEF) and paper copies will be sent to those indicated as non-registered participants on October 14, 2011.

*/s/ Gary Klein*

Gary Klein